## ALLEN (A FREEDMAN) *vs.* THE STATE.

[INDICTMENT FOR BURGLARY.]

1. *Burglary; what constitutes.*—Where the proof showed that the prisoner proposed to a servant a plan for robbing his employer's office by night; that the servant disclosed the plan to his employer, by whom it was communicated to the police; that the master, acting under the instructions of the police, furnished the servant with the keys of his office on the appointed night; that the servant and the prisoner went together to the office, where the servant opened the door with the key, and they both entered through the door, and were arrested in the house by the police,—*held,* that there could be no conviction of burglary.

2. *Judgment reversed, and prisoner discharged.*—Where the record sets out all the evidence connected with the alleged offense, and shows that the prisoner cannot be convicted under any indictment, the judgment of conviction will be reversed, (Penal Code, § 765,) and the prisoner ordered to be discharged from custody.

FROM the City Court of Mobile.
Tried before the Hon. H. CHAMBERLAIN.

THE indictment in this case was found on the 14th June, 1866, and charged that the prisoner, William Allen, a freedman, " broke and entered the office of Samuel Lyons, with intent to steal, in which office there was kept, at the time of said breaking and entry, goods, merchandize, or other valuable thing, for use, sale, or deposit." No objection to the indictment was interposed, and the only plea was, not guilty. "On the trial" as the bill of exceptions states, "the following facts, among others, were testified to by the witnesses on the part of the State :

" About two months previous to the alleged breaking, according to testimony of Leander Watkins, (a negro freedman,) the accused, Wm. Allen, proposed to said Watkins to join him in a robbery of Mr. Lyons' office. The plan suggested for this purpose by Allen was, that. Watkins should hire himself to Mr. Lyons as a servant, and, while thus employed, should embrace the first opportunity for stealing the pantaloons of Mr. Lyons, after he had retired to bed at night, and thus procure the key of his office, and that of his safe, which would probably be found in the pants. The keys being thus obtained, they would enter the office and safe, help themselves to the money there deposited, and then return the pants, with the keys in them, to the bedside of Mr. Lyons, before he awoke in the morning, so that they would not be missed by him, nor any discovery made of the authors of the burglary and theft, or of the means by which they had been effected. After a little, Watkins disclosed to his employer, Mr. Jack Weems, this proposition of Allen's ; and Weems communicated it to Mr. Lyons, the owner of the office which was the object of the alleged proposal. Lyons then communicated to the chief of the Mobile police, Stephen Charpentier, the information he had thus received, with the names of his informants. Charpentier told Lyons to ' leave the matter in his hands,' to which Lyons assented. Charpentier then ordered Richards, one of his subordinate officers, who knew Watkins, to arrest him, and bring him before him. This was done a few days afterwards, and Watkins then told Charpentier all that Allen had proposed to him. At this interview, Charpentier told Watkins he could have

both him and Allen arrested. He also told him to keep in with Allen, and if Allen proposed the matter to him again, to tell him he would do what he proposed, and then let him (Charpentier) know it. After this, Charpentier had no further interviews or conversations with Watkins himself, but the latter communicated with Lyons, his employer, and the owner of the office, and Lyons communicated with Charpentier. Subsequent to his interview with Watkins, above described, Charpentier advised Lyons to hire Watkins, and to give him all the chances to get the keys. Watkins subsequently came to Lyons, and proposed that the latter should take him into his employment as a hired domestic; and said, '*Allen had directed him (Watkins) to take service with Lyons*'; also, that he *had spoken to Charpentier, and it was all right;* that he was going to *follow instructions.* He also presented a written recommendation of himself as a servant, with *which,* he said, *Allen had furnished him.* He testified that Allen had suggested and directed him to take this course, and that he told Mr. Lyons of it. Upon this, Lyons took Watkins into his employment as a domestic servant at his house, but having no connection with his office. This was about the 22d May, which was about a week or ten days after Mr. Weems first informed Lyons of what he had learned from Watkins concerning the plot against him.

"For some time after Watkins had taken service with Lyons, as aforesaid, Allen was absent from the city. During his absence, Watkins called several times at the residence of Allen to see him, but did not find him at home. After Allen's return to the city, Watkins testified he had an interview with him. Charpentier testified that, on Friday, the 8th June, Lyons came to him, told him '*all was arranged for that night,*' and gave *him* one of the two keys which he had to his office. *This* night, Watkins testified, Lyons gave him the key to his office, and his pants. Lyons also testified that, on Friday night, he gave Watkins one of the keys of his office, and his pants, and gave the other key of his office to Charpentier, the chief of police. Watkins testified that, *this* (Friday) night, after receiving from Lyons the key to his office, and his pants, he went to Allen's

house, woke Allen up, got two carpet-sacks there, and he and Allen went to Lyon's office, but saw too many people there, and Allen was afraid; that they went back to Allen's house, and stayed awhile; came back to the office, when it was nearly day, but saw a man still standing there, and went off towards the market; then went to Allen's house, and left the carpet-sacks; and that he (witness) then returned to the house of his employer, Mr. Lyons, and returned the key and the pants. Lyons testified, that Watkins returned home about three o'clock Saturday morning, and told him 'Allen was afraid.'

"Charpentier, chief of police, testified that, after receiving from Lyons the notice above stated, viz., *'that all was fixed for that night,'* and getting from him one of the keys of his office, he procured the use of two rooms in the Battle house, fronting on St. Francis street, and directly across the street from the office of Mr. Lyons, which was No. 51 St. Francis, About 10 p. m., put several officers of his staff in Mr. Lyon's office. It was dark, and the blinds of the room at the Battle house were closed, but he could see. About twelve or one o'clock, he saw a boy about the size of Allen put the key in the door, but he became alarmed, probably by a noise made by a policeman with his club on the street above, and went off, leaving the key in the door. About three or four o'clock Saturday morning, a boy whom witness took for Watkins came along, and took the key out of the door.

"The next day, Saturday, the 9th June, 1866, Charpentier testified, he received a note from Mr. Lyons between four and five p. m., stating, ' *The thing is fixed for to-night, the force will be strong, and the burglars well armed.*' That night he put four of his officers in the office of Mr. Lyons, and took four others with him to the room in the Battle house which he had occupied the preceding night. This night, Saturday, 9th June, Lyons testified that he gave Watkins his office key, his pants, and his gold watch, and the two keys to his safes; the other key he gave to Charpentier. This night, Saturday, 9th June, Watkins testified, his employer, Mr. Lyons, gave him the key of his office, and told him ' *he had got everything fixed.*' He also gave witness his

pantaloons, and his gold watch, and told Watkins to let Allen have the key, and let him get into the office, if disposed to do so. He took the keys, pants, and watch, and went to Allen's house. Allen was asleep, but after he was called several times, Allen woke up; witness went in. They took two carpet-sacks; left Mr. Lyon's gold watch in the front room or parlor of Allen's house, on the mantel-piece, and the pantaloons on the table; and proceeded to Mr. Lyons' office on St. Francis street. When they reached there, witness gave Allen the key of the office. Allen put the key in the door, and, witness thought, turned the bolt of the lock, but did not open the door nor go in; but, on the contrary, they both walked past the office, and down the street, leaving the key in the door. After a little, they both returned, and Allen sat down on the steps of the barber shop, the building next to the office. After awhile Allen says, 'The way is clear, let us enter.' Watkins then turned the bolt, and entered, calling to Allen to come on; and that Allen followed immediately after him into the office.

"The testimony of what occurred after the entrance of Watkins and Allen into the office, was as follows: Watkins testified that, after they had both got into the office in the manner described, Allen lit a match. He then looked through the office, to see if there was any one there. He, Watkins, found the key of the back door in the lock on the inside, and the door unlocked but latched, and he (Watkins) unlatched the back door. His employer, Mr. Lyons, the owner of the office, had given him, at the house of Mr. Lyons, and at the same time he gave him the key of the office, the gold watch, and the pants, two other keys which he stated were the keys of the two iron-safes in the office. He (Watkins) gave one of these safe-keys to Allen, and the other he retained himself. After the match had been lit, he (Watkins) put the key he had in one of the safes, but did not open it; and then went to the other, and tried it in the same manner, but in vain; and while looking around, the police entered, and arrested both him and Allen. Allen, he stated, did not go nigh either of the

safes, nor attempt to make any use of the key given him for that purpose.

"Mr. Lyons, the owner of the office, testified that the two keys which he had given his servant, Watkins, before leaving his residence, as the keys of the safes in his office, were not such in fact, and, if they had been, neither Watkins nor Allen could have got into the safes with them; for the locks of the safes were combination locks, and no one not possessed of the secret of their combinations, could have opened them, even with the aid of the real keys themselves. Charpentier, chief of police, testified that, while he was watching the office of Mr. Lyons from the second story of the Battle house, where he and his four assistants were secreted, on Saturday night, 9th June, he saw, between two and three o'clock in the morning, two men walk by the office, stopping a little while in front of the door. They then came back, and sat on the steps of the barber shop. One of the men went to the door of the office, and went in, and then returned and said to the other 'come in,' whereupon they both went into the office. Witness then took the policemen, and went over to the office. He saw a light in the office, like the light of matches. He went to the door of the office, and saw there were but two men in there. He then had a light struck, and found Allen and Watkins there, and arrested them. When he went in and struck a light, he found Watkins close to the safe, and Allen close to the back door. Neither Watkins nor Allen had stolen anything. The other four policemen were concealed, as before stated, in the rear of the office, and cut off all egress in that direction, while the chief and his assistants entered in front. There was no one with Allen and Watkins, and Allen, upon being searched, had no arms, nor any dark lantern. On the way to the guardhouse, Watkins was permitted to escape. Mr. Lyons, owner of the office, testified that, on this night, Saturday night, the 9th June, he did not come to town, but remained at his residence on Dauphin way; that about three or four o'clock Sunday morning, Watkins came home to the house of witness; that he was very much excited, and told witness Allen had been arrested; that being interro-

gated on that point, witness replied, 'The police acted under my orders.' He testified that Watkins had communicated to him the plan, and that he informed the police; and Watkins testified that he acted in the matter according to the direction and suggestions of Allen. There was no evidence whatever adduced on the part of the defense, in relation to what occurred at the office; the witnesses on the part of the State, viz., Watkins, the servant of Lyons, and Charpentier, the chief of police, being the only persons, beside the accused, cognizant of what was done there. Mr. Lyons testified that there were considerable sums of money in the office at the time, belonging to him, and deposited with him by others for safe-keeping; that it is a banking office."

"The foregoing being all the testimony in the case, in relation to the alleged breaking and entering of the office, the court charged the jury, that if they believed the testimony which had been submitted to them, then the accused was guilty of breaking and entering the office of Samuel Lyons, as charged in the indictment, and they should so find in their verdict; to which charge the defendant excepted."

The jury returned a verdict of guilty, and the court thereupon sentenced the defendant to imprisonment in the penitentiary for ten years.

CHARLES H. MORSE, for the defendant, cited the following authorities: *Rex v. McDaniel,* Foster, 121–8; *Egginton's case,* 2 East's P. C. 666; *Rex v. Reane et al.,* 2 East's P. C. 734–5; *Regina v. Johnson,* 1 Car. & Marsh. 218 (41 Eng. Com. L. 123); 1 Russell on Crimes, 785–6; 1 Hawk. P. C. ch. 38; Hale's P. C. 551; 4 Bla. Com. 226.

JOHN W. A. SANFORD, Attorney-General, *contra.*—The offense was committed, when the accused unlocked the door, and entered the house with the intention of stealing. Roscoe's Crim. Ev. 323; 2 East's P. C. 487; 1 Russell on Crimes, 786. The fact that he was betrayed and entrapped by his supposed accomplice, or that the owner of the house was informed of the intended burglary, and, without the

knowledge of the accused, furnished the means of its perpetration, and placed policemen so as to arrest him, does not diminish his guilt.—1 Bishop's Criminal Law, § 344, and authorities cited; *Thompson v. The State*, 18 Indiana, 386; 23 U. S. Digest, 100.

BYRD, J.—It is unnecessary to notice all the questions discussed in the voluminous brief of the counsel. We are satisfied the prisoner is not guilty of the offense charged in the indictment, upon the evidence set out in the bill of exceptions. It is difficult to conceive how a person can be guilty of burglary, who enters a house with a key voluntarily furnished him by the owner to enter, knowing at the time that the person wishes to enter to steal. It is in effect a consent to the entry by such person, and is not even a trespass.

The witness Watkins was the servant and agent of the owner of the house in this transaction; and in this case, whatever the agent did, in conformity to his instructions and general authority, must be treated as done by his principal. If, then, the owner of the house had been in the place of Watkins, and had done what the latter did to get the prisoner into the house, certainly such an entry would not have been a trespass, much less a burglary.

The prisoner put the key in the door, and, as the witness Watkins "thought, turned the bolt of the lock." But his evidence shows that, soon afterwards, the witness himself turned the bolt, and called to Allen " to come on," and he followed the witness into the house; and as he did so without any breaking, actual or constructive, he was not guilty of burglary, however felonious may have been his intent in entering.—1 Hale's P. C. 553-4. It is somewhat like a man being robbed by his own consent, although the supposed robbers did not know of the consent.—*Reane's case*, 2 East's C. L. 734; *McDaniel's case*, Foster, 121.

But the following authorities are more in point to this case: 1 Bishop's Crim. Law, § 570 (344); *Egginton's case*, 2 East's Criminal Law, 666; *Regina v. Johnson and Jones*, 1 Car. & Marsh. 218, (41 Eng. Com. Law R. 123.) These cases are very much like this, and the principles announced

are applicable to the facts presented by the record before us. Allen neither opened the door, nor entered the house, until he was invited to do so by the servant of the owner; and he did no act, before or after he entered, which by our law is punishable criminally, so far as the evidence discloses; but this does not lessen the moral depravity of his conduct. After he entered, it seems that he had not the courage even to attempt the accomplishment of his intent, and left it to be done by his comrade and instigator, Watkins, his supposed accomplice.

In the case of *Regina v. Johnson and Jones, (supra,)* it appears that one Cole, who was groom to Mr. Drake, met with the prisoner Jones, and they entered into conversation about the badness of trade; and Jones said that he would not blame anybody who would rob another in these *hard times*, and asked Cole where his master kept his plate; and being told, said that, if he would let him into the house, he would give him £500. They agreed to meet again. Cole immediately told a policeman what had passed, and, his master being out of town, agreed to act under the directions of the police, in order to detect the prisoner Jones. Cole, Jones, and Johnson, met, and it was arranged that Cole should get the servants out of the way, and admit the two prisoners. In the meantime, several policemen were secreted in the house. Cole went and fetched Johnson to the house, at night, and lifted the latch of the stable-yard door, and a little gate, and also the kitchen-door, and let Johnson in, and followed him into the back kitchen. Johnson then went up stairs, and as he was about to open the door of the room in which the iron chest was deposited, the police seized him before he had done *anything;* and soon after Cole brought in the other prisoner in the same way, who went into the back kitchen, and took from it the plate basket containing the articles of plate mentioned in the indictment.

Maule, J., in summing up, (Rolfe, B., being present,) said: "It appears to me that, on the present occasion, according to the evidence, there was no such breaking as to constitute the crime of burglary. Cole, the groom, it is true, appeared to concur with the prisoners in the commis-

sion of the offense. But, in fact, he did not really concur with them; and he, acting under the directions of the police, must be taken to have been acting under the directions of Mr. Drake, the prosecutor." And it was held that neither Johnson nor Jones was guilty of burglary. This case is stronger in this, *that* here the owner actually gave the instructions to the servant, as also did the chief of police in part,

In *Egginton's case*, the prisoners applied to a servant of one Boulton, to aid them in robbing the house of his employer. The servant consented, and immediately gave information to Boulton; and he consented that the servant might *carry on the business*, and he (Boulton) *would bear him harmless.* The prisoners went at night, and the servant opened the door in the front yard. The prisoners entered the rooms where the plated business was carried on, and bolted the door; and then broke open the counting-house, which was locked, and the desks, which were also locked, and took from thence the ingots of silver guineas. They then went to the story above, into a room where the plated business was carried on, and broke the door open, and took from thence a quantity of silver, and returned down stairs, when one of them unbolted the door at the bottom of the stairs, which had been bolted on their going in, and went into the middle yard, where all but one were arrested by the persons placed to watch them. "On this case, two points were made for the prisoner. First, that no felony was proved, as the whole was done with the knowledge and assent of Mr. Boulton, and that the acts of Phillips (the servant) were his acts. Secondly, that if the facts proved amounted to a felony, it was but a simple larceny, as the building broke into was not the dwelling-house of any of the persons whose house it was charged to be; and that there was no breaking, the door being left open. After conviction, the case was argued before all the judges in the exchequer chamber; and for the reasons above stated, all the judges agreed that the prisoners were not guilty of the burglary."

It will be seen that one of the reasons, and the first assigned, was, that no felony was proved, as the whole was

done with the knowledge and assent of Mr. Boulton, and that the acts of Phillips were his acts.

2. The record in this case shows, that the only witnesses who were present at the time of the entry of the prisoner into the office on the night of the 9th June, 1866, were examined on the trial, and that all of their evidence "in relation to the alleged breaking and entering the office of Samuel Lyons ", is set out in the bill of exceptions ; and as that evidence clearly shows that the prisoner cannot be convicted on the indictment, or of any other offense, under the law as herein announced, we deem it our duty upon this record, and the authority conferred on this court by section 765 of the Penal Code, to reverse the judgment of the court below, and order the discharge of the prisoner from custody upon the indictment in this cause.