125 So.2d 716

Frank J. LINDSAY

v.

STATE.

6 Div. 732.

Court of Appeals of Alabama.

Sept. 6, 1960.

Rehearing Denied Oct. 4, 1960.

Geo E. Trawick, Birmingham, for appellant.

MacDonald Gallion, Atty. Gen., and Jerry L. Coe, Asst. Atty. Gen., for State.

CATES, Judge.

Lindsay was convicted of bribery. Code 1940, T. 14, § 63, as amended. He was sentenced to seven years imprisonment. The pertinent count of the indictment reads:

"The Grand Jury * * * charges that before finding of this indictment Frank J. Lindsay whose name to the Grand Jury is otherwise unknown, did corruptly offer, promise, or give to Robert L. Love and James E. Quinn, who were then and there police officers of the City of Fairfield, Alabama, after their employment, a gift, gratuity or thing of value, to-wit: $850.00, with intent to influence their act, decision or judgment on a matter or proceeding which was then pending, to-wit: an investigation of an illegal lottery operation, commonly known as a numbers game or policy game, then and there being carried on or operated in said City or the police jurisdiction thereof; * * * against the peace," etc.

The following questions have been put to us: (1) Was Mr. Lindsay illegally en- trapped into making the payments? (2) Was the indictment adequate (a) since it did not—as does the statute—say "in their official capacities," or (b) because no ordi- nance laying down the duties of Fairfield policemen was averred? (3) Was the join- der of two payees in one count wrong? (4) Was it error to admit evidence of seven other later payments after proof of Lind- say's paying the first bribe of $100? (5) Did the proper formalities attend the ad- mission of Minifon magnetic wire re- cordings?

The State's evidence tended to show:

In June, 1958, Messrs. Love and Quinn became detectives on the police force of the city. They were investigating lotteries in the nature of numbers or policy games bearing names such as The King and Queen, The Bell, The Joe, The G. I., The F. F., The Night Rider and The Big Six.

From a batch of some seventy balls bearing different numbers, twelve are drawn. To make a "gig" which pays a dollar for a dime, the player must have picked three of the numbers on the twelve balls "in combination." The players carry "Dream Books" which give clues to num- bers from dreams or allegorical circum- stances.

Shortly before August 11, 1958, Lindsay telephoned Love at police headquarters and arranged to meet him and Quinn. The three first met August 11 at the Howard Johnson restaurant in Central Park, Bir- mingham.

Lindsay explained that he carried on The G. I. lottery. A "station operator," Lily Mae Calhoun, handled "The G. I." for him in Fairfield.

Love and Quinn promised him no pro- tection but agreed to meet him again. The second meeting took place a fortnight later. Lindsay announced business was better; he had made $190 in Fairfield in four and a half days.

After talking of expanding, Lindsay asked them how much would it cost to op-

erate in Fairfield. Love and Quinn said that they didn't know "about the lottery operation," they "were young." Lindsay then remarked that he would give them a hundred dollars, to which Quinn rejoined, "Is that apiece?" Lindsay replied, "No. I'll give you a hundred dollars for both of you."

Love and Quinn again made no promises but took the money which Lindsay said was for him to go ahead with his operation in Fairfield. Lindsay set up another meeting about a month later.

As soon as they left Lindsay, the two detectives met Mr. John Boyce, a special agent of the intelligence division of the Internal Revenue Service, who had encouraged them to strike up contact with policy operations. They gave the bribe money to Boyce. After marking each bill, Boyce in turn gave it to Mr. Thomas Ward, Chief of the Fairfield Police.

For the next eight months Love and Quinn were double agents, of police and of policy. They met Lindsay at one or the other of two rendezvous (both in the Bessemer Division of Jefferson County) where, on six occasions, he paid them $100 and twice handed over $125.

Before and after each meeting, Boyce would search them, verifying the net increase in their worth. In three instances he strapped a Minifon magnetic wire recorder under Love's clothing. The recordings were played before the jury.

In his conversation, August 25, 1958 (which was the first one recorded), Lindsay told Love and Quinn that in Birmingham he gave each police prowl car, "individuals," $25 a month. "Used to give them $40.00, back when we were operating right."

The defense evidence varied: Lindsay's account was that Love approached him through Lily Mae who reported that the detectives wanted to get in touch with him. She gave him the telephone number. He testified Love said, "I want to see you. Where can we meet?"

When the three got together at the restaurant, Lindsay's testimony went, Love asked him if he thought he could make money if the two detectives left him alone.

On the second meeting, Love (according to Lindsay) demanded, "Well, how much can you afford to give us?" Whereupon Lindsay asked, "Well, would a hundred be all right? A hundred a month?"

Lindsay emphasized that Love and Quinn first suggested that he pay them. Moreover, at one of the later meetings they brought along Barney Cohen, another policy operator, who wanted a monopoly at Fairfield. Lindsay's testimony implied that Love and Quinn wanted Cohen to take over Lindsay's Fairfield operation.

█ Unlawful entrapment as a defense to an offense where consent is not material is ordinarily a question resting on the facts of a particular case. It rests on the defendant's admitting the deed but disclaiming the thought. 22 C.J.S. Criminal Law § 45; 15 Am.Jur., Criminal Law, §§ 335–37; Anderson, Wharton's Cr.L. and Proc., § 132; Johnson v. State, 36 Ala.App. 634, 61 So.2d 867; but cf. Allen v. State, 40 Ala. 334, and Browning v. State, 31 Ala. App. 137, 13 So.2d 54.

In the annotation in 69 A.L.R.2d 1397, at page 1401, we find:

"* * * whether there was an illegal entrapment in a bribery prosecution is ordinarily a matter which should be submitted to the jury under proper instructions, particularly where the testimony of the accused tends to support the defense, or the evidence with respect to entrapment is conflicting. * * *"

The affirmance in Masciale v. United States, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859, is based on a conflict of evidence requiring a jury.

In Genesis 3:13 we hear an unsuccessful plea of entrapment to Original Sin, "The serpent beguiled me and I did eat."

■ · One may·read long and far to find a better exposition than that of Learned Hand, J., in United States v. Sherman, 2 Cir., 200 F.2d 880, 882:

" * * * In Sorrells v. United States, supra [287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413] all the Court agreed as to the meaning of *inducement*: it was that someone employed for the purpose by the prosecution had induced the accused to commit the offense charged, which he would not have otherwise committed. That was a defence, to which, if proved, the minority thought there was no reply, but to which the majority thought that there was, and obviously we must accept that view. Indeed, it would seem probable that, if there were no reply, it would be impossible ever to secure convictions of any offences which consist of transactions that are carried on in secret. On the other hand there are difficulties in knowing what should be a valid reply. As we understand the doctrine it comes to this: that it is a valid reply to the defence, if the prosecution can satisfy the jury that *the accused was ready and willing to commit the offence charged, whenever the opportunity offered.* In that event the inducement which brought about the actual offence was no more than one instance of the kind of conduct in which the accused was prepared to engage; and the prosecution has not seduced an innocent person, but has only provided the means for the accused to realize his preexisting purpose. The proof of this may be by evidence of his past offences, of his preparation, even of his 'ready complaisance.' Obviously, it is not necessary that the past offences proved shall be precisely the same as that charged, provided they are near enough in kind to support an inference that his purpose included offences of the sort charged.

\* \* \* \* \* \* ·

"Therefore in such cases two questions of fact arise: (1) did the agent induce the accused to commit the offence charged in the indictment; (2) if, so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. * * *" (Italics supplied.)

In 1958 the Supreme Court of the United States in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (on appeal from another conviction), and in Masciale v. United States, supra, adhered to Sorrells. As Wisdom, J., said in Washington v. United States, 5 Cir., 275 F.2d 687, 689:

" * * * Under Sorrells, Sherman, and Masciale, the issue of entrapment is a question for the jury, unless as a matter of law the defendant has established beyond a reasonable doubt that he was entrapped. * * * [citing cases] In determining if there has been entrapment as a matter of law this Court has considered not only the predisposition of the accused but has weighed also the conduct of the government agents. * * *"

■ Under our jurisprudence to raise "entrapment as a matter of law," the defendant would have to (1) move the court (a) to exclude the evidence, or (b) to give a written affirmative instruction, or (c) to file a motion for a new trial; and (2) support one of these requests by uncontradicted evidence of unimpeachable weight and credibility, e. g., by the undisputed testimony of the State's own witnesses.

■ Even though the State, to secure evidence, is shown to have tempted the accused, yet if there is proof of his active appetite for forbidden fruit,[1] the issue of

---

1. "Such disposition * * * may be evidenced in various ways, including response to the particular request and, in some situations, by a revealing recent course of conduct or activity."—United States v. Sawyer, 3 Cir., 210 F.2d 169, '

causation is one of fact for the jury. Here there was evidence in Lindsay's own conversations of his predisposition, particularly of contemporaneously paying Birmingham officers in "prowl cars." Moreover, we should be naive if we did not recognize that undisputed proof of Lindsay's "policy" game showed a criminal activity often associated with police "protection."[2] Hence there was no error in submitting this issue to the jury.

No exception to the oral charge of the court was taken, and hence no error can be posited on any claimed fault therein.

The court refused Lindsay's charge which we labeled "D":

"The Court charges that no trap to catch the defendant for the offense of bribery may be made use of by the officers unless it appear from the evidence that the defendant was at the time engaged in a course of conduct of bribing officers in Fairfield, Alabama. It is not enough that he may have been engaged in operating a lottery there."

Without commenting on "unless it appear from the evidence," bribing officers in Fairfield is too confining as to the latitude which should be allowed the State to rebut any tendency of Lindsay's evidence that he was a theretofore innocent newly beguiled. Moreover, operating a lottery affords temptation to seek corruptible officers.

Charge "G," refused, reads:

"The court charges that if you find from the evidence that the officers Quinn and Love, either or both of them, originated the idea of suggesting to the defendant Lindsay that he give to them a bribe or other emolument, as charged in the indictment, and that such idea or scheme originated entirely with the said officers, albeit in an effort to catch the said defendant Lindsay in the act of said bribery or the attempt thereof, you must, nevertheless, find the defendant not guilty."

We consider misleading the notion of "originated entirely" related to the idea of "suggesting [bribery] to the defendant." There was no evidence that a third party suggested to Lindsay that he bribe Love and Quinn. Moreover, we think "entirely" might mislead because it tends to ignore whatever causative factors which might come from the defendant's predisposition and will power.

Several of the charges requested would have required a finding that the "intent" to bribe "originated" with the accused before there could be a conviction. Since the prosecution may rebut the inference flowing from evidence of inducement by its agents, "intent" of the defendant is but part of the picture.

We consider that the objection to the indictment's not stating the matter before Love and Quinn was before them in their official capacities falls from a reading of count 1. The accusation specifically qualified Love and Quinn with "who were then and there police officers of the city," and then averred that Lindsay acted "with

---

170. " * * * a nine-year-old sales conviction and a five-year-old possession conviction are insufficient to prove * * * a readiness to sell * * * "—Sherman v. United States, supra [356 U.S. 369, 78 S.Ct. 822].

2. However, it should be borne in mind that the "shake down" may cause first offenders to bribe. "The bribery cases raise a different problem. Offers to bribe made to a public official should not be regarded as entrapment. The offense is of such gravity; the evidence so difficult to obtain, and the temptation so constant and recurring that the government is justified in testing its officers. On the other hand, a government agent should not be permitted to entrap a private citizen by demanding that a bribe be given for protection. An incorruptible enforcement staff is capable of dealing with bribe givers whenever they appear. There is no need to seek him out. Furthermore, an innocent man, fearful of official retaliation might readily yield to such a request." Donnelly, Judicial Control of Informants, et al.; 60 Yale L.J., 1091, 1115.

intent to influence their act * * * on * * * to-wit: an investigation of an illegal lottery operation."

As the trial judge pointed out in his oral charge to the jury:

"* * * the investigation and suppression of crime within a municipality are matters which are officially pending before the duly authorized police officers of such municipality. * * *"

There was no need, if any exists in other instances, for the grand jury to aver that an ordinance of the City of Fairfield laid down the duties of Love and Quinn which Lindsay sought to corrupt. Code 1940, T. 14, § 282, provides in part as to lottery law violations:

"* * * the police or other executive officers of [every] city or town have authority, on receiving information, or having good cause to believe that any person is violating or has violated said sections [Code 1940, T. 14, §§ 275 and 278] within such territory, to arrest such person and carry him before the mayor or other judicial officer for trial."

As to the indictment describing the recipients together, it is argued that this, in effect, is a charge of two distinct offenses and should not have been contained in one count, in that it amounts to an allegation that the defendant bribed two persons.

It is abundantly clear from the evidence that each payment was made to Love and Quinn without Lindsay dividing it into a share from one to the other. Indeed, the conversation as to whether or not the amount was to be $100 each was quickly refuted by Lindsay himself.

As to the admission of the evidence of the other payments after the proof of the first bribe, we see no harm to the defendant since the State itself chose to treat the $850 as one bribe rather than as eight. Lindsay got the best of the bargain in the State's merging the other seven instances into a single charge.

One exception to the rule in Mason v. State, 259 Ala. 438, 66 So.2d 557, 42 A.L.R.2d 847, permits evidence of other crimes to show system. Had the State charged Lindsay with eight separate bribes, testimony of the other seven would have been relevant in order to negative illegal entrapment. See Brown v. State, 37 Ala. App. 516, 74 So.2d 273. Therefore, no harm comes from treating all eight payments as installments.

The Minifon wire recordings have been replayed by this court en banc. Though in a few places they are somewhat scratchy in tone and unequal in volume, by and large they are audible and contain substantial and essential conversations in which Lindsay took part and during which he was present at all times.[3] These recordings provide direct and independent evidence. The jury heard the voice of Lindsay when he handed money to the two officers: if credited, this was part of the res gestae. He later took the stand thereby giving the jury the opportunity to identify his voice.

After the State laid a foundation of authenticity and electronic capability, the trial judge took the precaution of having an advance playing of the recordings outside the hearing of the jury. He denied a request that the court reporter transcribe the conversations. This did not comply with the procedure[4] given in Wright v. State, 38

---

3. In United States v. Schanerman, 3 Cir., 150 F.2d 941, at page 944, partly inaudible recordings were likened to "conversations, overheard in part by human witnesses." See also Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49, and Conrad, Magnetic Recordings in the Courts, 40 Va.Law Rev. 23.

4. A companion set of rules is derived from Solomon, Jr., Inc. v. Edgar, 92 Ga. App. 207, 88 S.E.2d 167. See also United States v. McKeever, D.C., 169 F.Supp. 426, 430; Annotation 58 A.L.R.2d 1024, 1027, 1032; Fikes v. State, 263 Ala. 89, 81 So.2d 303.

Ala.App. 64, 79 So.2d 66. However, we see no harm to the defendant because the substance of the recorded conversations had already come in through the testimony viva voce of Messrs. Love and Quinn. Moreover, we consider the jury could certainly have heard enough to get from the recordings a fair cross section of their import.

■ We have carefully considered the record in accordance with the requirements of Code 1940, T. 15, § 389, and consider that there has been no error to the probable prejudice of any substantial right of the defendant. Accordingly, the judgment below will be

Affirmed.

## On Application for Rehearing

Lindsay's application says we have left eight unanswered questions. So as not to choke off any higher review because of our seemingly leaving out any facet of our consideration, we shall take them up seriatim with each followed by our answer.

Q. "2. Where a statute is general, is it sufficient in the indictment to merely follow its language, or must the indictment allege the specific offense coming under the general description of the statute in order to satisfy the constitutional right of the accused to be informed of the nature of the cause of action against him?"

A. Omitting details of the path of our reasoning, we hold the indictment sufficient.

■ Q. "5. Is it reversible error to receive, over objection, evidence in a bribery trial of extensive lottery operations when the defendant is not shown to be connected with them and their relevancy to the issue are not shown?"

A. In this case it was not error because (1) the indictment alleged "an investigation of an illegal lottery operation," and (2) if the court erroneously admitted evidence of there being in operation lotteries in addition to Lindsay's "G. I.," the error was harmless.

■ Q. "6. Can a tape recording of a conversation had with the defendant be offered in evidence without showing the voluntary character of the statement?"

A. Yes, unless it contains a confession. The conversation here was not a confession, but of the res gestae.

■ Q. "8. Is it error to admit in evidence, tape recordings of an alleged conversation between the defendant and two officers when no person who heard that conversation listened to the playing of the records in court and no one identified the conversation of the various voices?"

A. In this case the purported recordings were introduced through the testimony of Boyce. Boyce had seen the meetings of Lindsay with Love and Quinn, Boyce had hidden and removed the loaded Minifon on Love's person on each of the three "bugged" meetings, Love corroborated the testimony of Boyce's secreting and taking the machine on and from Love's person. The court had theretofore heard Love and Quinn testify viva voce. By process of elimination, the third voice was Lindsay's. The trial judge, on the playback out of the jury's presence, had the duty (and discretion) to determine whether the unidentified voice presented a misleading resemblance to that of either Love or Quinn. We consider there was no abuse of that discretion.

■ Q. "9. Where a recording contains illegal evidence, can it be admitted and played to the jury in its entirety and the jury instructed to disregard the illegal evidence?"

A. It is claimed that a recorded statement, "This is a recording of a statement of Frank J. Lindsay," was hurtful. The trial judge instructed the jury the statement so heard was not evidence. We do not here apply the rule in Kissic v. State, 266 Ala. 71, 94 So.2d 202, 67 A.L.R.2d 530, because the instruction removed the statement from evidence. There was no ineradicable harm in it.

Q. "10. Is it error to permit recordings of an alleged statement by the defendant to the jury without having the official court reporter take the audible portion down stenographically?"

A. Under Wright v. State, supra, it would have been better to have done so: failure to do so, however, is not error.

■ Q. "11. Is it error to charge the jury in a bribery case that the defense of entrapment does not lie if defendant was already engaged in criminal conduct and to refuse requested charge that the criminal conduct engaged in must be of the same character as that in which he was entrapped in order to deprive him of this defense?"

A. It is argued that Lindsay's prior conduct might partake of lottery but the jury could not fit this evidence to this part of the charge because the court's language was imprecise. No exception was taken to the oral charge. Moreover, evidence of prior criminal conduct which might reasonably be considered as tempting a man to offer a bribe has probative value to negative entrapment.

■ Q. "12. Is it proper for the Judge to state in the presence of the jury 'I think the recording was taken by Mr. Love in this matter', referring to a recording offered in evidence by the State?"

A. The statement was of an undisputed fact, as we view the evidence. Even should it be thought of as relating to a contradicted matter, we see no harm in it.

The only other point which we think might not be sufficiently covered in the opinion on original deliverance related to the propriety of this court's listening to the recordings.

By our oaths we are required to search the record in criminal cases as commanded by Code 1940, T. 15, § 389. In this connection we have held the omission of exhibits from a record precludes our review as to the sufficiency of the evidence. See Graham v. State, 40 Ala.App. 471, 115 So.2d

289, and authorities there cited; also Hobson v. State, 36 Ala.App. 471, 58 So.2d 898, where omission of handwriting specimens from appendix to appellate record prevented evaluation of testimony as to forgery.

Hence, if we may look at those things of which the jury, in Wigmore's language, had "autoptic proference," then by analogy we may listen to those of which they had auscultative proference.

Application overruled.