Dennis Williams was charged with the unlawful sale of marijuana contrary to law. The jury found him "guilty as charged," and the trial judge set sentence at seven years' imprisonment in the penitentiary.
Houston County Police Officer Wallace Williams testified that he received a telephone call from one Jimmy Ray King, who made inquiry as to whether or not Officer Williams would like to purchase some marijuana, to which Williams responded that he would. King indicated that he knew someone who had 25 pounds that he wanted to sell. Officer Williams then made arrangements to meet King and his friend at room 278 at the Leon Motel at 3:00 o'clock that afternoon. King indicated that his friend was one Dennis Williams, the appellant. Officer Williams then indicated that they would meet as arranged and make payment at the time of the purchase that afternoon at the Leon Motel.
After this telephone conversation Officer Williams and Dothan Police Officers Robert Sorrells and Wendell White went to room 278 at the Leon Motel and installed a transmitting device known as a "bug" in the room. Officer Wendell White remained in the room and the other two officers went just down the hall where they could monitor the conversation.
About 3:00 o'clock in the afternoon, Officer Williams stated that he recognized Jimmy Ray King drive into the area in an automobile and saw him get out and that King and the defendant, Dennis Williams, then entered room 278 at the motel. A short time later Williams saw Jimmy King come back out and back the automobile near the door of room 278 and he overheard part of a conversation with Officer White, King and the defendant. From the record, R. 14:
 "Q All Right. Go ahead — go ahead and tell the jury, now, what you heard them say in there in the room?
 "A Mr. Williams here had gone in the door with a little shoulder bag on and I heard him say, you know, said here is a sample. And, then I heard him say, `Do you have the money?' And Wendell White replied, `Yes, I do.' And there was a little pause there and then the defendant here was telling Wendell White, `I don't want to do the deal here. Let's go down the road and we transport it from my car to your car.' And Wendell was *Page 951 
telling him he didn't want to do that, that it was safer right there at the room and just back the car up there and let's do it right here.
"Q What happened at that time, Sergeant Williams?
 "A So Jimmy King backed the car up there and they unloaded four paper bags out of the trunk of the car into the room.
"Q Who was doing that unloading?
"A The defendant and —
"Q Was White with him at that time?
 "A I believe it was the defendant and Wendell White. I don't recall where Jimmy King was there helping them unload or not.
 "Q Okay. Now, these four bags that the defendant was getting out of the trunk, would you describe those to the jury, please?
 "A They were just brown paper bags; all that I could see was just brown paper bags like grocery shopping bags.
 "Q Okay. Now, when he went to the trunk to get those bags out, did he take the key out of his pocket or anything?
 "A I don't recall who opened the trunk of the car because there was — we were so close by that we were not observing everything that happened other than the — hearing what was going on because we — part of the time when they were outside, we had to keep down real low in the van because we were real close by.
 "Q But, you saw the defendant carry the grocery bags inside that room, is that correct?
"A Yes, sir.
 "Q Okay. From the trunk of that vehicle? Could you describe that vehicle to the jury the best you can, please, sir?
 "A It was — an older model car, a white or an off-white, I believe it was a Pontiac.
 "Q Okay. Now, after they did that, what was the next thing that happened in regards to you; did you receive a phone call?
 "A Yes, I did. Well, the signal was from Officer White, when he got the marijuana, he would start weighing it and he — you could hear him on the transmitter when — he was in the process of weighing. And he weighed it, he told the defendant here that — said, `I can call and get the remainder of the money.' And he placed the phone call to the girl that works in our office. And she, in turn, called the radio dispatch and told me to meet Wendell White at 278 Leon Motel. I waited five, six, seven, eight minutes before I went to the door. I went and knocked on the door and Wendell White opened the door.
"Q Okay. Did you have anything with you at that time?
"A Yes, sir, I had a briefcase.
 "Q Were you going to act as the person that was going to buy or bring the additional money?
"A Yes, sir.
 "Q Okay. After you appeared at the door with the briefcase, what happened at that time?
"A I knocked on the door and Wendell White let me in.
"Q Who all was in the room at that time?
"A Wendell White and the defendant here.
"Q Was Jimmy Ray King in the room?
"A No, Sir.
 "Q But the marijuana was in the room, is that correct?
"A Yes, sir.
 "Q Okay. Now, after you went inside, what happened, then, please, sir?
 "A Wendell, I believe, asked me, `Do you have the rest of the money?' And I indicated yes I did and when I went in at the door, I left it cracked three or four inches and then right behind me, just a minute or so behind me, in walked Officer Sorrells with — and two of the investigators from the State Attorney's Office and one of the investigators was in the car with Chief Williams and they came walking in right behind Mr. Sorrells and the two Florida State Investigators.
"Q Okay. And what happened at that time? *Page 952 
"A Robert Sorrells placed the defendant under arrest.
"Q And did he search him at that time?
"A Yes, sir, he did."
Officer Williams then stated that he and the other officers began looking for the appellant and found that he had left Alabama and that it was about a two-year period before he was located and brought to trial.
Dothan Police Officer Wendell White stated that together with Officers Wallace Williams and Robert Sorrells, he went to the Leon Motel July 27, 1978. He stated that earlier that day they had placed a listening device in the room. White stated that the appellant, Dennis Williams and Jimmy Ray King came into the room and that the appellant asked White where was the money; that he wanted to see it. At this point, White stated that he showed him part of the money and then Dennis Williams removed a shoulder bag and from it pulled out approximately one pound of marijuana and stated that this was "a sample" and for White to look at it. White stated he recognized the green vegetable material as being marijuana and took it and weighed it on some scales which he had in the room. White stated that the appellant wanted to transfer the remaining marijuana in some cars at a different location, but that White insisted that the exchange be made in the room where he could weigh it. From the record, R. 38:
"Q And what did you do with it at that time?
 "A At that time I weighed it, examined it and asked him where the other was. And he said that he had the rest of it in his car. And I asked him to bring it to the room and, at this point, he didn't want to bring all of it to the room. He wanted me to leave with him and go somewhere and make the exchange in the cars.
 "Q Okay. Now, at this point, was it just you and the defendant talking about all this?
"A Yes, Sir.
"Q Was Jimmy Ray King talking?
"A No, sir. He was just sitting on the bed.
 "Q Okay. And the defendant wanted you to go down the road to make the transfer?
"A Right. He didn't want to do the deal in that room.
"Q Okay. And what happened then?
 "A I told him that I wouldn't do the deal unless I could weigh it all and get it in that room where I could weigh all of it. And, at that point, Mr. Williams had Jimmy King bring the car to the room and backed it up to the door. We got the marijuana out of the trunk in four grocery bags, brought it into the room and proceeded to weigh each bag of it.
"Q Okay. Now, who is `we' that got the marijuana out?
"A Dennis Williams and myself.
 "Q Okay. Did ya'll just go to the trunk and was it open or what?
 "A Yes, sir. He opened the trunk and started getting it out and handing it to me and I'd take it in and set it down by the night stand where the scales was. (sic)
"Q Okay. Was Jimmy Ray King around at that time?
 "A To the — he could have been standing around or somewhere, but Dennis Williams was doing all of the exchanging with myself. He would hand it to me and I'd set it down by the night stand.
 "Q Okay. So, this grocery bag, he'd take one out of the trunk, hand it to you, you'd take it inside the motel room?
"A Yes, sir.
 "Q Okay. These grocery bags, how many of them were there, please, sir?
"A There were four.
"Q And what was in those grocery bags?
"A Green vegetable material.
"Q Were they packaged?
 "A They was (sic) in a large zip-loc baggie approximately hold a pound of marijuana.
 "Q Okay. And how many packages were in the four grocery bags? *Page 953 
"A In those four, there was (sic) nineteen."
White testified that a few moments later he went to the door on the pretext of answering a phone call so that he could obtain the additional money and as he did so, Officer Sorrells, Officer Williams and three Florida agents came into the room and placed the appellant, Dennis Williams, under arrest.
Houston County Officer Robert Sorrells corroborated the testimony of Officer Wallace Williams and Officer Wendell White concerning the events at the Leon Motel on July 27, 1978, and his arrest of the appellant. He identified some photographs made of the appellant at the time, showing a blue purse or shoulder bag which the appellant carried on that date. Officer Sorrells then marked the marijuana which was seized in the room with his initials and took it to the Enterprise Crime Lab where it was turned over to Investigator Charles Brooks.
Charles F. Brooks testified that he was a Laboratory Administrator and Evidence Analyst at the Enterprise Criminal Lab, and on August 9, 1978, he received a large, sealed cardboard box from Officer Robert Sorrells which contained 21 clear plastic bags, each containing green leafy plant material. He stated that he weighed the material and analyzed it, making several tests, and found that it contained a total of 9,195 grams, or 20 1/4 pounds of marijuana, the most active ingredient of which is tetrahydrocannabinol.
At this point, the appellant made a motion to exclude the State's evidence on the basis that a prima facie case had not been presented. This motion was overruled.
The appellant took the stand in his own defense and testified that he had been employed with the Holmes County Ambulance Service in Florida from 1974 until July, 1978, and was making approximately $500.00 a month. He stated that he was not married, but he was working to help support some younger brothers and sisters. Dennis Williams admitted that he had tried smoking marijuana in school but had stopped that. He admitted he had one arrest in January, 1974, for possession of marijuana. He stated that he had graduated from high school and that he had known Jimmy Ray King growing up, and that King did not graduate. Williams indicated that he had run into Jimmy Ray King several days prior to July 27, 1978, and that they had a drink together and that since he had a day off, King had asked him to go with him and help him get a house trailer. He stated that he did so and they had borrowed a friend's automobile and had driven to Vernon, Florida. They ran into some "lady friends," messed around and decided to come on back. He stated that they did stop in Vernon and that he saw King talking to a man and saw someone put some material in the trunk of the car. He stated that they then drove back toward Dothan and that when they got back, King stopped and made a telephone call and then made some comment about wanting to meet a fellow at a hotel. Williams stated that King drove the car to the Leon Motel and that King unloaded the car, taking the bags of materials into the room where they encountered the Dothan police officers. Williams maintained that he was not aware that the marijuana was in the car, but that he and King were arrested and put in a police car and taken to the city jail for questioning. He stated that three days later he got out on bond and thereafter left the state of Alabama and remained away for approximately two years before he was subsequently arrested and brought back to trial.
On cross-examination, Williams admitted that he had some valium in his pocket and that it was removed by the police officer at the time of his arrest. He stated that he had a prescription and had three "pills" which he used as a relaxer and that he had this prescription about two years prior to his arrest.
The State recalled Charles Brooks who identified valium as a mild tranquilizer which is prescribed by doctors and that valium is on the Alabama Uniform Controlled Substances list. Brooks indicated that valium was the trade name for the *Page 954 
drug and that it was manufactured by Roche Laboratories.
Officer Sorrells was then recalled and testified that he knew that Jimmy Ray King, at the time of the incident on July 27, 1978, had charges of possession or sale of marijuana and sale of phencyclidine pending against him.
 I
The appellant contends that he was induced or lured by the arresting officers into the commission of the offense in question, and asserts the defense of entrapment.
 Former Presiding Judge Carr, in Johnson v. State, 36 Ala. App. 634, 61 So.2d 867 (1952) stated:
 "The pertinent parts of Sec. 45, 22 C.J.S. Criminal Law § 45, p. 100 et seq. are as follows:
 `The doctrine of entrapment, however, has a limited application, the basic thought being that officers of the law shall not incite crime merely to punish the perpetrator; hence a distinction has been drawn between the inducing of an innocent person to do an unlawful act, and the setting of a trap to catch one in the execution of a criminal plan of his own conception, an act of the latter character by an officer not being regarded as against public policy, and entrapment is not available as a defense to a person who has the intent and design to commit a criminal offense and who in fact does commit the essential acts constituting it, merely because an officer of the law, in his effort to secure evidence against such person, affords him an opportunity to commit the criminal act, or purposely places facilities in his way or aids and encourages him in the perpetration thereof.
 `An officer may, when acting in good faith with a view to detecting crime, make use of deception, trickery, or artifice; and so it is not a defense that decoys were used to present an opportunity for the commission of the crime or that detectives or others feigning complicity in the act were present and apparently assisting in its commission. Especially is this true in that class of cases where the offense is one of a kind habitually committed, and the solicitation merely furnishes evidence of a course of conduct; it has been held that in such cases the entrapper may even provoke or induce the commission of a particular violation of the law, if he knows or has reasonable grounds to believe that accused is a repeated or habitual offender.'"
More recently, this court in Miller v. State, 53 Ala. App. 213,298 So.2d 633 (1974) held:
 "Of particular importance on the question of inducement of appellant to commit the crime is Lindsay v. State, 41 Ala. App. 85, 125 So.2d 716, cert. stricken, 271 Ala. 549, 125 So.2d 725; Garsed v. State, 50 Ala. App. 312, 278 So.2d 761.
 "Other cases from this jurisdiction where the criminal sale of unlawful commodities such as liquors, narcotics, etc., were made at the solicitation and request of officers whose identity was disguised are Webb v. State, 42 Ala. App. 385, 166 So.2d 510; Dodd v. State, 32 Ala. App. 307, 26 So.2d 273, cert. denied 248 Ala. 103, 26 So.2d 274; Nelson v. City of Roanoke, 24 Ala. App. 277, 135 So. 312, cert. denied 223 Ala. 317, 135 So. 314. These cases hold that where the appellant is disposed to commit the crime and the officers merely provide the opportunity by request or encouragement to commit the criminal act, there is no entrapment. See Alabama Digest, Criminal Law, Volume 6, Key number 37."
Under the circumstances in this case, and the authorities herein cited, we see no room for the operation of the defense of entrapment in the instant case. See Reynolds v. State,56 Ala. App. 509, 323 So.2d 394, cert. denied, 295 Ala. 415,323 So.2d 404 (1975). See also Pearson v. State, 362 So.2d 1278
(Ala.Cr.App. 1978).
 II
The appellant asserts as error the overruling of his motion to exclude the *Page 955 
State's evidence for failure to establish a prima facie case. We are of the opinion that the trial court correctly overruled this motion and submitted this case to the jury. Authorities herein cited and McCart v. State, 387 So.2d 232 (Ala.Cr.App. 1980), cert. denied, 387 So.2d 237 (Ala. 1980).
 III
Appellant asserts that the trial court improperly permitted the State to question him concerning the possession of some valium tablets at the time of his arrest.
It should be first noted that no objection was interposed at trial to this line of questioning, thus this matter is not preserved for our review.
Moreover, those items found in the possession of appellant at the time of his arrest were properly admitted. See Brantley v.State, 294 Ala. 344, 317 So.2d 345 (1975) and authorities therein cited.
We have carefully examined this record and find no error therein. This case is hereby affirmed.
AFFIRMED.
All the Judges concur.