312 So.2d 45

James Robert WEST, Jr.

v.

STATE.

1 Div. 525.

Court of Criminal Appeals of Alabama.

Feb. 18, 1975.

Rehearing Denied March 18, 1975.

William J. Baxley, Atty. Gen., and Donald V. Watkins, Sp. Asst. Atty. Gen., for appellee, the State.

Reynolds T. Alonzo, Mobile, for appellant.

TYSON, Judge.

The three-count indictment charged the appellant with unlawfully killing "Billy Dannelley by stabbing him with a knife," or by "striking him with a blunt instrument," or by "beating him to death with his fists and feet."

Appellant was represented at trial by two experienced court-appointed attorneys. The jury found the appellant guilty of murder in the first degree and fixed punishment at life imprisonment. The trial court then entered judgment in accordance with this verdict. The appellant is in this court with a free transcript and briefs by appointed counsel.

The indictment in this cause arose from an incident which occurred on the evening

of March 26–27, 1974, in the duplex apartment in which the deceased, Bill Dannelley was last seen alive.

According to Kenneth Etheridge, the co-tenant in this duplex apartment building, located on South Georgia Avenue, Mobile, Alabama, he was awakened by the sound of voices in the adjacent apartment about 12:30 a. m., on March 27, 1974. He testified that it sounded like three people entering the apartment, that he dozed back to sleep, and was again awakened by the noise of someone falling to the floor, and a "scuffling and arguing going on." He testified that he last heard the voice, which he recognized as the deceased's, saying, "Oh my God, oh my God," and later, "Please don't." He stated that then things quieted down, that later two men began arguing, and one voice said, "Well, let me get my car keys." Still later, he heard a voice, which he did not recognize, saying, "Let me help wipe up the blood."

He further testified that he had met the appellant, James West, who had been introduced to him two days before by the deceased as they were going into the apartment.

The State presented the testimony of James Robert West, Sr., the father of the appellant, who testified that on the morning of March 27, 1974, around 8:00, the appellant and his brother, Glenn, came to his home, driving the automobile, which he recognized as belonging to the deceased, Billy Dannelley. The appellant and his brother told their father that they needed some money, he told them that the bank would not open until 9:00 a. m., and that he would go with them at that time and get the money. He testified that the appellant and his brother, Glenn, had two little dogs in the automobile, which he recognized as belonging to the deceased, Billy Dannelley. Mr. West further testified that his two sons returned shortly before 9:00 a. m., and that he went with them and cashed a check for $55.00, kept $5.00, and gave the remaining $50.00 to his sons.

Clinton Dannelley testified that he was the brother of the deceased, Billy Dannelley, and that he had gone to Elizabethton, Tennessee, where he recognized the body of his brother, Billy Dannelley, in the Memorial Funeral Home. He further testifed that in the Sheriff's office in Elizabethton he recognized two dogs, which were at the Sheriff's office.

Sergeant Joseph Connick, a detective with the Mobile Police Department, testified that he went to the apartment-duplex residence of the deceased, Billy Dannelley, on March 27, 1974. He testified that he noticed glass broken out of the front door as he entered the living room, and some bed clothing lying on the couch. As he walked into the kitchen, he observed splatters of blood on the door and there was garbage on the kitchen floor. He noticed a broken windowpane, and what appeared to be human hair in the broken glass. He stated that blood was on the floor and walls. He testified that he then entered the bedroom. From the record:

"Q. Did you go into the bathroom?

"A. Yes, the bathroom, the shower curtains were saturated with blood, what appeared to be blood inside and outside.

"Q. Both sides?

"A. Both sides of the shower curtain, and blood on the floor and walls, behind the door there was a scuff mark, there were bath towels in a container, a plastic container, they appeared to be saturated with blood, there was a bath mat that was saturated with what appeared to be blood, blood around the commode and in the bathtub, there was hair in the bathtub, also what appeared to be bloodstains, there was hair on the floor in the bathroom. The bedroom of this apartment, the bed was without a spread, just a blanket on the top of it. There was a portion of hair on the top of the bed.

"Q. Do you mean on the blanket?

"A. Yes, on the blanket."

The officer then identified several photographs made of the apartment, then testified that he went to Elizabethton, Tennessee, where he talked with Captain Eulas Sargent of the Carter County Sheriff's Department, that from Captain Sargent he received a number of exhibits.

Detective Connick then identified a cardboard with a piece of human hair, an automobile tag, a bedspread, and a shirt, all of which were found on or near the body of the deceased in a trash dump just outside Elizabethton, Tennessee. He also identified some towels, three kitchen knives, and some broken glass, which were found in the apartment of the deceased. He further testified he was present when other officers took samples of the blood from the kitchen and bathroom.

Captain Eulas Sargent testified that he investigated the finding of a body in a ravine, which body was partly covered up in the trash. He testified that the site was not a public trash dump, but because of the fairly steep sides up to the road, passers-by continued to throw trash and litter in this area. Captain Sargent testified that he assisted in bringing the body from the ravine back to the mortuary, and that the body was "limp." He identified a lock of hair which had been clipped from the head of the deceased and placed in an envelope, then subsequently turned over by him to Sergeant Connick. He also identifed a bedspread, license tag, and shirt, which were found at the scene and also turned over to Sergeant Connick.

Captain Sargent also identified a number of photographs made at the scene where the body was found. He testified that there was a deep facial cut on the deceased, also a cut on one leg where the pants were torn.

Warren Delp testified that he was a Special Agent for the FBI in Richmond, Virginia. He testified that he examined a 1973 Mercury Cougar, which had been reported missing, on the Enrico County parking lot in Richmond. He identified a piece of floor mat, which was removed from the trunk of the vehicle by him.

Marion Sennett testified he was employed by the Department of Toxicology of the State of Alabama. He testified that Officer Meyers and Detective Connick turned over to him some envelopes which contained some human hair. He testified that he compared this with other human hair, which had been delivered to him by officers as coming from the head of the victim. He testified that the hair in question was "dark brown Caucasian with specks of gray," and that the color and texture of each was the same, that he found human blood on each, that he compared this with human blood found on a watchband which had been delivered to him by the officers, and, further that they were of the same blood type. He testified that he found human blood on the shirt and bedspread, and also on the piece of carpet which was delived to him by the FBI.

Lieutenant Samuel L. McClarty testified that he was employed by the Mobile Police Department and that he took part in an investigation of the death of Billy Dannelley. He identified a carpet, which had been received by him from the FBI, and which he in turn delivered to Mr. Sennett at the Toxicology office.

Homer Salyer testified that he lived in Spruce Pine, North Carolina, that this was about fifty-five miles from Elizabethton, Tennessee, that the appellant was his son-in-law, and that on March 28, 1974, about 10:00 in the morning, the appellant came to his home driving a Mercury Cougar and gave two dogs to him. He said that the appellant asked him to "give these dogs to his children."

Clinton Dannelley, the deceased's brother, was recalled to the witness stand, and he identified photographs of the 1973 Mercury Cougar, which, he testified, he went to Richmond, Virginia, and received from the police there and brought back to Alabama; that this was the automobile that belonged to his deceased brother. He fur-

ther testified he had met the appellant at his brother's apartment, and that his brother had told him that he was visiting him.

James Robert West, Sr., the appellant's father, was then recalled to the witness stand. He testified that his two sons, Robert and Glenn, had come by to see him on Monday, March 26, 1974, and that his son Glenn had gone to work with him one day, that Glenn had driven down a few days before with his brother, Robert, and the deceased, Billy Dannelley, and had brought his wife from North Carolina to visit; that they were driving in the deceased's automobile when they came to see him, that the two boys told him that they were staying in the deceased's apartment.

Tarvis Dannelley testified that he was a brother of the deceased, Billy Dannelley, that he had gone to his brother's apartment after telephoning and not getting an answer on March 27, 1974, that when he went in he found the front door broken open and blood on the kitchen and bathroom floors and walls, and that he notified the police. He also identified the 1973 Mercury Cougar, maroon in color, with a vinyl top, which his brother, Clinton Dannelley drove back to Mobile from Richmond, Virginia.

Wiley Davis testified that he had gone to the apartment of the deceased after receiving a telephone call from his brother, Travis, on March 27, 1974, and that he called his brother back that night. He testified that he had first seen the deceased the previous night at the J. V. Lounge, on Tuesday, March 26, 1974, and that he subsequently saw him later that evening at the Golden Rod Club, that the appellant was with him and that they were drinking beer.

Dr. R. D. Jones, Jr., testified that he was a medical doctor, practicing in general practice, and was also a pathologist, with five years training. He testified that he examined a body on March 30, 1974, at the Carter Memorial Hospital and performed an autopsy. He testified that the victim was a man, who had been severely beaten and appeared to have a head injury. He testified that he found a small pellet in a muscle near the heart, but that this had nothing to do, in his opinion, with the cause of death. He said that, in his opinion, the cause of death was due to a "subdural Hematoma," and was caused by severe blows to the head area. He also testified that there was a large laceration extending from the deceased's mouth to his scalp. He further testified that he determined rigor mortis to be moderate, especially in the left arm.

Bobby Lee Edwards testified that he lived in Raeford, North Carolina, that he was an uncle of the appellant. He testified that the appellant came to his home on March 29, 1974, driving a maroon Cougar Mercury. He testified that the appellant said he had lost his tags, that he took the tags off his own automobile, which were Virginia license tags, and put some gas in the car, that the two of them then drove over to see an uncle, named Rufus Edwards, who lived in Richmond, Virginia. He testified that they stayed a short time at the home of Rufus Edwards, and then as they were driving down the street, drinking beer, they were pulled over by police officers, who asked for their identification. Mr. Edwards testified that he had had his probation revoked while going out of State during the time he was serving a charge for issuing bad checks. He testified that he had had previous convictions for larceny and taking an automobile. He testified that while he and the appellant were together driving from North Carolina to Virginia, the appellant told him about being at a bar in Mobile, drinking beer with a man, and that the man jumped on him and they began fighting. He said they left and that the man had been a part-time school teacher. He said that they went to the man's home, drank beer, and began fighting again. He said that he grabbed the man, that the man was biting on his finger, that he would not turn loose, so the appellant then took a kitchen knife and cut a muscle in the man's leg, that he then hit him on the head four or five times

to get his hand loose. He further testified that the appellant then stomped the man with his boots, then put him in the trunk of the car and drove to a dump near Elizabethton, Tennessee, where he threw out the body. He said that the man was so messed up, he figured he had better finish him.

On cross-examination, Edwards admitted convictions for assault with a deadly weapon, and interstate transportation of a stolen vehicle.

Also on cross-examination, when asked about the stomping of the victim, he testified that the appellant said he had to kick him three times to make him stop trying to run, and that at one time he had tried to get out of the trunk to run away.

The appellant's motion to exclude the State's evidence for failure to make out a prima facie case was overruled. The appellant presented the testimony of Dr. Nelson Grubbs, State Toxicologist, who testified that the usual test for alcohol in the human system is through blood tests. He further testified that a man of the average size and weight could drink six to eight beers and would be under the influence for several hours. He further testified that depending upon the temperature of the human body, it takes about eight hours for rigor mortis to set in, that it normally stays for an additional eight hours and then begins to leave the body. He further testified that a "subdural hematoma" is a loose blood clot under the scalp, which was common from a slight head injury, but that a severe wound could cause death.

The appellant then presented the testimony of his brother, Glenn Franklin West, who testified that he first met the deceased, Billy Dannelley, in the company of his brother, the appellant, in Raeford, North Carolina, on March 23, 1974. He testified the two men had come to North Carolina to bring his mother and himself back to Mobile. He testified that they drove back to Mobile and went to his father's apartment where they spent the first night. He testified that they awoke Sunday afternoon, March 24, 1974, and got together with the deceased that night at his apartment and drank some beer. He testified that they spent the night at the deceased's apartment, that the next morning Billy Dannelley told them that he had to go to school as he was a driving instructor, and would see them later that day. He testified that Monday night they went out, drank beer, and had dinner with the appellant, that they also spent Monday night at the deceased's apartment. He saw the deceased leave on Tuesday morning to go to school, and that the deceased drank a couple of beers before leaving. He next saw the deceased around 4:00 or 4:30, Tuesday afternoon, that the deceased and his brother drank beer with him until about 7:30 that evening. He said they then took him to a bar up town and dropped him off, that they said they would be back to pick him up as they were going to some wrestling matches. He said he was not too familiar with the Mobile area, but that his brother and Mr. Dannelley came back and picked him up, that he went to another bar and had some more beers. He said that the two men then dropped him at his father's house on Church Street, and that he did not see the deceased again. He testified that his brother, the appellant, returned about 7:30 Wednesday morning, and that they called his father and asked for some money to go back to North Carolina. He said that after getting the money, they picked up Mr. Dannelley and that Mr. Dannelley and his brother dropped him out on the Causeway about 9:30 or 10:00 on Wednesday morning so he could hitch hike to North Carolina. He testified that other than a cut on the deceased's lip, he did not see any signs of a fight the previous night, and that when he last saw his brother and the deceased, his brother was driving the deceased's car with the deceased in it on Wednesday morning.

I

The appellant contends the trial court erred in overruling his motion to ex-

clude the State's evidence, and partially because the venue of the offense was not proven.

Title 15, Section 93, Code of Alabama 1940, reads as follows:

*"Offense commenced here, but consummated elsewhere.*—When the commission of an offense, commenced here, is consummated without the boundaries of this state, the offender is liable to punishment therefor; and the jurisdiction in such case, unless otherwise provided by law·is in the county in which the offense was commenced."

As may be seen from the evidence above, it is clear that blows had been struck by the appellant on the person of the deceased in Mobile County, Alabama. We are of the opinion that venue was here sufficiently proven under the above statute, and Green v. State, 66 Ala. 40, so that venue and the jurisdiction over the offense was properly here shown to be in Mobile County. See Green v. State, supra, and authorities therein cited.

■ Under the facts here presented, the trial court properly submitted this case to the jury. Aaron v. State, 54 Ala.App. 71, 304 So.2d 625,·and cases cited therein.

## II

■ The appellant contends that several photographs of the apartment and the clothing of the victim were too gruesome and should not have been admitted. We are of the opinion that the photographs and clothing and other articles found at the site where the deceased's body was found were relevant to show the wounds inflicted, and, therefore, properly admitted in evidence. The fact that such were gruesome did not prevent their being admitted. Smarr v. State, 260 Ala. 30, 68 So.2d 6; Nichols v. State, 267 Ala. 217, 100 So.2d 750; Grissett v. State, 241 Ala. 343, 2 So.2d 399, Williams v. State, 54 Ala.App. 244, 307 So.2d 53.

## III

■ The appellant contends that in several instances the Assistant District Attorney made prejudicial closing argument. In one instance, he says that there is as much believability in Edwards, State witness, as the bad character we have on trial here today.

We have carefully examined this instance, and in light of the trial court's instructions to the jury to disregard such comment, and inquiries made of the jury, "Is there any single juror who cannot completely erase that from their mind?" We are of the opinion that prejudicial error was not shown in this instance. Farr v. State, 54 Ala.App. 80, 304 So.2d 898; Adair v. State, 51 Ala.App. 651, 288·So.2d 187, and cases cited therein.

■ Appellant next objects to the District Attorney's argument when he said that "We don't need to stomp him to death —that is what happened in Europe in 1939," and what we had was a "slaughter," and that the appellant was "one of the most vicious people," which comments are urged as error.

We note that at the conclusion of the trial court's oral charge, the appellant announced, "No exceptions." In the trial court's oral charge, it firmly admonished the jury that argument of the attorneys was not evidence in the case, and they alone were sole judges of the facts; that they should disregard any statements made by the attorneys which were different from testimony given by witnesses on the witness stand; further, the court would charge on the law and to disregard statements made by the attorneys in the course of argument.

We believe these instructions covered the alleged prejudicial argument so that error to reversal is not here shown. George v. State, 54 Ala.App. 90, 304 So.2d 908, and cases therein cited.

Such statements were merely arguendo of the opinion of the prosecutor, and in light of the trial court's instructions, reversible error is not shown. Barnett v. State, 52 Ala.App. 260, 291 So.2d 353, and cases therein cited; Adair v. State, supra.

## IV

 The trial court gave fifteen written requested charges, and refused two others. The affirmative charge was properly refused under the evidence in this cause. Title 7, Section 273, Code of Alabama 1940. Refused charge twelve is an incorrect statement of applicable law, and moreover was invasive of the province of the jury; hence, the same was properly refused. Title 7, Section 273, Code of Alabama 1940.

We have carefully examined this record as required by law, including all rulings adverse to the appellant, and find same to be free from error. The judgment is due to be and the same is hereby

Affirmed.

All the Judges concur.

## ON REHEARING

TYSON, Judge.

On original deliverance, we indicated that reversible error was not here shown by virtue of the several statements made by the Assistant District Attorney in closing argument. We do not wish to be understood as approving the language used in such argument, but are firmly of the opinion, in light of the trial court's instructions, that reversible error is not here shown. Authorities cited on original deliverance.

Opinion extended, application overruled.

All the Judges concur.