323 So.2d 394

**John Grover REYNOLDS**

v.

**STATE.**

**1 Div. 599.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1975.

Rehearing Denied Oct. 28, 1975.

Willis W. Holloway, Jr., Mobile, for appellant.

William J. Baxley, Atty. Gen., and Sarah M. Greenhaw, Asst. Atty. Gen., for the State.

TYSON, Judge.

The appellant was indicted for the unlawful sale of Marihuana to J. D. Burchett. The jury found the appellant guilty as charged, and the trial court fixed punishment at four and one-half years imprisonment.

J. D. Burchett testified that he was an employee of the Alabama ABC Board, working in the Alcohol and Drug Division. He testified that on November 14, 1974, he had been sent to Mobile, Alabama, to work as an undercover agent with the police in the city of Mobile. He testified that on November 14, 1974, he went to the Burger King Restaurant located at the corner of Government and Common Streets, and there met the appellant, John Grover Reynolds. He testified that he accompanied the appellant to the Montauk Apartments on Montauk Avenue and entered Apartment A–9. He stated that on this occasion he was accompanied by an informer also, by the name of Michael Norton. He stated that upon entering the apartment he asked the appellant where the stuff was, that appellant said it was down the hall in a bedroom, that he was seated, and in a few minutes the appellant returned with a brown paper bag, and sat it down in front of him. He said the appellant told him that inside the brown bag were two smaller bags which contained Marihuana, and that the price would be $300.00. He testified that he then paid the appellant and left the apartment. He stated that he took the brown paper bag containing the two smaller bags of green vegetable material, which he believed to be Marihuana, to the ABC Field Office at 1052 Dauphin Street in Mobile. He said that after going in this office, he turned over the brown paper bag to Sergeant Don Gill of the Narcotics Division of the Mobile Police Department.

Sergeant Don Gill testified that on November 14, 1974, he saw ABC Agent J. D. Burchett in the Burger King at Government and Common Streets. He said he saw him leave in an automobile, and that

he trailed him to the Montauk Apartments on Montauk Avenue. He stated that at about 8:56 p. m. Mr. Burchett met him at the ABC Field Office, that he received a brown paper bag, containing two smaller bags of a green vegetable material, that he placed his initials on the brown bag and sealed it up on November 14, 1974. Sergeant Gill further testified that the next morning, November 15, 1974, at 9:28 a. m., he delivered this brown paper bag to Miss Alilee Pillman at the State Toxicology Office in Mobile.

Miss Alilee Pillman testified that she was an employee of the Criminal Laboratory Office of the State Department of Toxicology in Mobile. She testified that part of her duties was to make various chemical tests for this department, and that she had been trained under Dr. Rehling. She testified that she received a brown paper bag on November 15, 1974, at 9:28 a. m., from Mobile Police Sergeant Don Gill. She testified that she opened the bag and examined the contents, that it contained two smaller paper bags. She stated that each of these smaller bags contained Marihuana, a total of 798.4 grams, or 27.5 ounces, that this was a little over a pound and a half. The two bags of Marihuana, which had been in her possession, were then admitted into evidence.

The appellant's motion to exclude the State's evidence was then overruled. The appellant presented the testimony of several character witnesses, each of whom testified that appellant's general character and reputation for truth, on November 14, 1974, was good.

The appellant, John Grover Reynolds, testified that he was an employee of the Alabama Dry Dock and Shipbuilding Company, and had first met an individual named Michael Norton when the two of them worked at Ingalls Shipyards. He testified that just prior to November 14, 1974, he had several telephone calls from one Michael Norton and had agreed to meet him at the Burger King on the corner of Government and Common Streets that evening. He testified that he did so, and then later was accompanied by Mike Norton and Mr. Burchett when he went to Apartment A–9, at the Montauk Apartments, that this apartment belonged to Carl Nelson. He testified that he did not know there was any Marihuana on the premises, that Carl Nelson had made the arrangements with Mike Norton concerning the Marihuana, and that Carl Nelson walked down the hall and brought the Marihuana back into the room and just handed it to him.

On cross-examination, the appellant stated that Mike Norton had made the arrangements with Carl Nelson concerning the Marihuana, and that he simply took the man over to Carl Nelson's apartment. He admitted, on cross-examination, however, that he knew that a sale was taking place, and that the price was $150.00 a pound for two bags which were then put in a brown paper bag.

I

Appellant first argues that the trial court erred in overruling his demurrer which challenged the indictment on the basis that the same did not properly identify the unlawful substance allegedly sold by the appellant in violation of law. The demurrer further stated that the indictment referred to the substance as "marijuana," when the Alabama Uniform Controlled Substances Act[1] refers to the substance as "marihuana," hence the item charged in the indictment is not among the substances listed in the Alabama Uniform Controlled Substances Act.

The Alabama Supreme Court in *Boswell v. State*, 290 Ala. 349, 276 So.2d 592, determined that the Alabama Uniform Controlled Substances Act satisfies the

1. Title 22, Section 258(25)–258(60), Code of Alabama 1940, as amended 1971.

constitutional requirement of having a single subject, and further that the Legislature could include Marihuana with so-called "hard drugs," that such was a reasonable classification. See also *Sawyer v. State*, 50 Ala.App. 490, 280 So.2d 196; *Kenny v. State*, 51 Ala.App. 35, 282 So.2d 387, cert. denied 291 Ala. 786, 282 So.2d 392.

■ Moreover, recently this Court in *Peppers v. State*, 53 Ala.App. 695, 304 So. 2d 39, cert. denied 293 Ala. 770, 304 So.2d 43, and *Haynes v. State*, 54 Ala.App. 714, 312 So.2d 406, cert. denied 294 Ala. 758, 312 So.2d 414, determined such an indictment to be legally sufficient.

### II

■ The appellant next contends that his plea of entrapment should have been sustained by the trial court. In light of the testimony in this cause, we are of the opinion that there was no room for the operation of the defense of entrapment. *Johnson v. State*, 36 Ala.App. 634, 61 So.2d 867; *Miller v. State*, 53 Ala.App. 213, 298 So.2d 633, cert. denied 292 Ala. 741, 298 So.2d 639; *Peppers v. State*, 53 Ala.App. 695, 304 So.2d 39, cert. denied 293 Ala. 770, 304 So.2d 43.

### III

During the district attorney's closing argument, the following occurred [R. pp. 52–53]:

"MR. HUGHES: He said he wasn't in the business of selling marijuana, but it's hard to tell that he wasn't in the business when he's sitting there taking $300.-00 from the guy—

"MR. HOLLOWAY: Now, Judge, I'm going to object to the Assistant District Attorney's stating 'It's hard to tell that he wasn't in the business.' and holding up this bag of marijuana, as improper argument.

"MR. HUGHES: Your Honor, I don't know—

"THE COURT: On what grounds, Willis?

"MR. HOLLOWAY: That it's improper argument seeking to impassion and prejudice the jury; and the other grounds would be alleging crimes not included in the indictment.

"THE COURT: Just confine it to what he's charged with, Mr. Hughes; confine it to 'that he did sell marijuana.'

"MR. HUGHES: All right, Judge—

"MR. HOLLOWAY: Judge, could I have a ruling on that last objection?

"THE COURT: Overrule the objection.

\* \* \* \* \* \*

"MR. HUGHES: This (a fine up to $25,000.00) isn't going to cut out this sort of thing in Mobile County, but it might cut John Grover Reynolds out of doing it in Mobile County.

"MR. HOLLOWAY: Judge, now I'm going to object to that, where the Assistant District Attorney stated, and I quote, 'that this may not cut this out in Mobile County, but it will stop John Grover Reynolds from doing it in Mobile County,' as being improper argument.

"THE COURT: Confine it to this one case, Mr. Hughes; let's try him on this one charge now. I'm going to sustain the objection. He is only charged with one offense.

"MR. HOLLOWAY: Judge, I would move for a mistrial.

"THE COURT: Motion denied."

■ The appellant asserts the above rulings to be erroneous. As may be seen, the district attorney, when he held up the bag of marihuana, made the statement, "It's hard to tell that he wasn't in the business," was pointing out matters of evidence and

arguing their legitimate inferences. Such was properly within the scope of the evidence, and the trial court's ruling in this respect was proper. *Barnett v. State,* 52 Ala.App. 260, 291 So.2d 353, and authorities therein cited.

Further, in light of the trial judge's instructions, shown above, as indicating to the district attorney to confine his argument to the case at hand, the trial court properly overruled the appellant's objection and motion for a mistrial.

Clearly, this ruling is correct. We believe that these instructions covered the alleged prejudicial argument so that error to reversal is not here shown. *George v. State,* 54 Ala.App. 90, 304 So.2d 908; *West v. State,* 54 Ala.App. 647, 312 So.2d 45, cert. denied 294 Ala. 78, 312 So.2d 52; *Barnett v. State,* supra, and authorities therein cited.

### IV

At the conclusion of the trial court's oral charge, the appellant announced, "No exceptions." The trial judge then gave six of the written requested charges. The remaining refused charges were either covered by the trial court's oral charge and the given charges, or were abstract, not properly predicated on the evidence in this case, were misleading, or were incorrect statements of the applicable legal principles; hence, their refusals were proper. Title 7, Section 273, Code of Alabama 1940.

We have carefully examined this record and find same to be free from error. The judgment of the trial court is due to be and the same is hereby

Affirmed.

All the Judges concur.

### ON REHEARING

Appellant's counsel asserts that this Court did not fully or correctly state certain facts in its original opinion in this cause in two aspects. From appellant's brief in support of his application for rehearing, he states:

> "That part of the opinion stating that Agent J. D. Burchett testified
>
> " '. . . That he was seated, and in a few minutes the appellant returned with a brown paper bag, and sat it down in front ow [sic] him. He said the appellant told him that inside the brown bag were two smaller bags which contained Marijuana . . .'
>
> is also incorrect. The transcript clearly shows that Agent Burchett *NEVER* stated these facts. In fact, no one ever testified to anything resembling these statements.
>
> "Finally, the opinion NEVER mentions the fact that the agent (informer), Michael Norton, was being paid $25.00 by the Mobile Police Department for every case he made. (R. 26)
>
> "Appellant strongly requests that the Court re-examine the transcript."

In ABC Agent J. D. Burchett's testimony, which commences on Record Page 18 of the Transcript in question, after having testified that he was working at the time as an undercover agent with the police in Mobile County, he testified with reference to his meeting with Mr. Reynolds, the appellant, as follows [R. PP. 19–21]:

"Q. All right. Now, you saw him at the Burger King. Then what if anything happened?

"A. He told me to follow him.

"Q. When you say 'he,' who are you talking about?

"A. Mr. Reynolds.

"Q. And he told you to follow him; all right, sir. And where did you go?

"A. Followed him to an apartment complex, Montauk Apartments on Montauk Avenue.

"Q. Now, you're going to have to speak up a little louder. Okay, you followed him to the Montauk Apartments on Montauk, is that right?

"A. Yes, sir.

"Q. What if anything happened then?

"A. Got out of the vehicle and went to Apartment A–9.

"Q. What if anything happened then?

"A. Subject opened the door and I followed Mr. Reynolds and the informer inside.

"Q. Inside the apartment?

"A. Inside A–9.

"Q. All right. What if anything happened then?

"A. Mr. Reynolds and the other gentleman that was in the apartment turned facing me and I asked him where the stuff was and he said it's down the hall—

"Q. You've got to keep it a little bit louder and maybe a little bit slower so everybody can hear you.

"A. We walked in and asked where it was; they said it's down in the bedroom down the hall, and pointed to which was to my right down a little hall; and I went into the bedroom and it was setting in a brown paper bag—two bags, setting at the foot of the bed in this bedroom.

"Q. All right. What if anything did you do then?

"A. I knelt down and felt of it and smelled it, and turned to Mr. Reynolds and asked him how much, Three Hundred; and he—

"Q. All right. You say you looked in the bag?

"A. Yes, sir.

"Q. What if anything did you see in the bag?

"A. Green plant like material.

"Q. Had you had an occasion prior to this time to see marijuana?

"A. Yes, sir.

"Q. Did this have the same appearance?

"A. Yes, sir.

"Q. Did it appear to you to be marijuana?

"A. Yes, sir.

"Q. Okay. What if anything did you do then?

"A. Well, I turned to Mr. Reynolds and asked him how much, Three Hundred; and he said yes—

"Q. Now—go ahead, I'm sorry.

"A. —and so I pulled out my wallet and started counting out Twenty Dollar bills until I got $300.00; and I handed it to Mr. Reynolds.

"Q. And that's the man seated over here?

"A. Yes, sir.

"Q. And you paid him $300.00?

"A. Yes, sir.

"Q. Now, this $300.00, that's not your money, is it?

"A. No.

"Q. Whose money is that?

"A. It was furnished by the City of Mobile for an undercover operation.

"Q. Okay. Now, this apartment you said you were in, can you tell me where that is located in—

"A. Montauk Avenue.

"Q. And in what city is that?

"A. Mobile, Alabama.

"Q. And what county is that in?

"A. Mobile.

"Q. And state?

"A. Alabama.

"Q. Okay. And this is where the sale took place, is that right?

"A. Yes, sir.

"Q. All right. After you gave Mr. Reynolds here the money, what if anything did you do then?

"A. I picked up the bag—the two bags and told him well, I had to go.

"Q. How long were you in the apartment altogether?

"A. I'd say approximately three minutes.

"Q. Okay. Where did you go after you left?

"A. To the ABC's Field Office, 1052 Dauphin Street.

"Q. Which is how far from the apartment?

"A. I'd say approximately five blocks.

"Q. Okay. What if anything did you do then?

"A. Went inside with the evidence and handed the evidence to Sgt. Gill of the Mobile Police Department."

The appellant also questions one aspect of this Court's statement concerning the appellant's testimony. From appellant's brief:

"This Court found the following facts from Appellant's testimony:

" 'He testified that he did not know there was any Marijuana on the premises, that Carl Nelson had made the arrangements with Mike Norton concerning the Marihuana, and that Carl Nelson walked down the hall and brought the Marihuana back into the room and just handed it to him.

" 'On cross-examination, the appellant stated that Mike Norton had made the arrangements with Carl Nelson concerning the Marihuana, and that he simply took the man over to Carl Nelson's apartment.'

"Appellant submits that this finding of facts is erroneous and has absolutely *NO BASIS ANYWHERE IN THE TRANSCRIPT,* and Appellant strongly requests that the Court redirect its attention to pages 43–50 of the transcript.

"Appellant testified that he had not 'seen this marijuana' (R. 45) but that he 'knew there was marijuana in that apartment.' (R. 48) He further testified that *he* negotiated the sale with Mike Norton (R. 45, 48) and that

" '. . . Carl Nelson said it was back there in the back, and we went on back to the back and it was on the floor, and he picked it up and looked at it . . .' (R. 46)"

The appellant's testimony on direct examination commences on Record Page 43, and describes himself as being twenty-one years of age, and an employee of the Alabama Dry Dock and Ship Building Company. He states that he met one Michael Norton when working at Ingalls Shipyards, and that his conversation had been with Mr. Norton by telephone prior to his understanding that he would meet with Mr. Burchett. The appellant's testimony concerning this is as follows [R. PP. 45–49]:

"MR. HOLLOWAY: Mr. Reynolds, concerning this particular night, when was the first time that you saw Mr. Burchett?

"A. At the Burger King.

"Q. At the Burger King, all right. Did Mr. Burchett make any negotiations concerning this sale with you?

"A. No, he did not.

"Q. And who made the negotiations concerning this?

"A. Mike Norton.

"Q. All right. Now, how many times did he contact you concerning this?

"A. In a two or three week period before it happened, he must have contacted me ten times or more by the telephone calls.

"Q. Mr. Reynolds, are you in the business of selling marijuana?

"A. No, I'm not.

"Q. All right. On this occasion did you have any marijuana in your possession?

"A. No, I did not.

"Q. All right. Who did the marijuana that we've heard of in the testimony today belong to?

"A. It belonged to the man at the apartment that we went to.

"Q. All right. Who was that person?

"A. Carl Nelson.

"Q. All right. That was Apartment A–9?

"A. A–9 I believe it said.

"Q. Now, when you went to the apartment, had you, prior to this night of the 14th—had you been over there prior to that time and seen this marijuana?

"A. No; I had not.

"Q. And when Undercover Agent Burchett went there, who told him where the marijuana was?

"A. Mr. Nelson did.

"Q. All right—

"A. We went in the door, and he told him it was back down the hall.

"Q. All right. Just tell the jury what happened.

"MR. HUGHES: Your Honor, I'm going to object to the narrative form answer. Let him ask the proper questions, because I don't know what may or may not be objectionable.

"THE COURT: Wait now; he has us right there in the apartment in Mr. Burchett's and Mr. Norton's presence. You can tell us anything now that was done or said in your presence and in Mr. Burchett's presence—only on that occasion.

"WITNESS: Well, we went in the apartment and he said—Carl Nelson said it was back there in the back, and we went on back to the back and it was on the floor, and he picked it up and looked at it, and then he gave me the money, and then they left and I gave the money, and then they left and I gave the money to Mr. Nelson.

"MR. HUGHES: I object, Your Honor; that was out of Mr. Burchett's presence and there's no way to offer what he's saying; and I ask that that be striken—whatever happened after Mr. Burchett left.

"THE COURT: I'm going to leave that up to the jury, Greg; and I'm going to let you cross him on that. I overrule the objection.

"MR. HOLLOWAY: Did you ask Mr. Burchett for the money?

"A. No, sir.

"Q. He just handed it to you?

"A. Just handed it to me.

"Q. Now, on these ten or more times that Michael Norton contacted you concerning this, what did he tell you?

"MR. HUGHES: I object, Your Honor; that would be hearsay.

"THE COURT: Sustained.

"MR. HOLLOWAY: That's all.

"THE COURT: Any cross?

"MR. HUGHES: Yes, Your Honor.

"CROSS EXAMINATION

"BY MR. HUGHES:

"Q. Mr. Reynolds, you said that Mr. Norton called you and negotiated the sale with you several times, is that right?

"THE COURT: I've ruled out what Norton said now, Greg.

"MR. HUGHES: Your Honor, he testified to that, that Norton called him and they negotiated the sale several times.

"THE COURT: I've just ruled it out now; but now if you want to try to get into it, that's something else.

"MR. HUGHES: Well, I'm sorry, I—

"THE COURT: His last question was what Norton said, and I sustained it on the ground that it was hearsay.

"MR. HUGHES: Your Honor, I apologize.

"THE COURT: All right.

"MR. HUGHES: You said you met Agent Burchett at the Burger King, is that right?

"A. That's right.

"Q. And you led him over to this apartment, is that not right?

"A. That's right.

"Q. Nobody made you lead him over there, did they?

"A. Nobody was making me, no sir.

"Q. Nobody made you do anything in connection with this, did they?

"A. No, nobody made me.

"Q. You did everything involved in this transaction—you did that on your own free will, didn't you?

"A. I did it as a favor for—

"Q. I'm not asking you why you did it. I said, did you do it of your own free will?

"A. That's right. I was telling you why—

"Q. I'm not asking you that. You led Agent Burchett to the apartment, right?

"A. That's right.

"Q. You went in that apartment, right?

"A. Yes, sir.

"Q. You knew there was marijuana in that apartment, didn't you?

"A. Yes, sir.

"Q. You knew that there was a sale taking place, didn't you?

"A. Yes, sir.

"Q. You had negotiated the sale, hadn't you?

"A. (No response.)

"Q. I'm waiting.

"A. Yes.

"Q. All right. You negotiated the sale; then you got the money from Agent Burchett, didn't you?

"A. Yes, but I didn't get the money.

"Q. I didn't ask you that. I asked you did you—

"MR. HOLLOWAY: Judge, I'm going to object to him arguing with the witness.

"THE COURT: Let him answer.

"MR. HOLLOWAY: And I'm going to ask him to slow down, too—give him time to answer.

"THE COURT: Yes, sir. Give the witness a little bit more chance to answer now. Repeat your question, Mr. Hughes.

"MR. HUGHES: Mr. Reynolds, you got $300.00 or thereabouts—was it $300.00?

"A. Yes, sir.

"Q. You got the money yourself, didn't you?

"A. No, I did not get it.

"Q. Who was it paid over to?

"A. It was Mr. Nelson's money—

"Q. I'm not asking you—

"A. He handed the money to me, but I didn't get the money.

"Q. Agent Burchett paid the money over to you, is that right?

"A. That's right.

"Q. And anything you claim to have happened, happened after Agent Burchett had gone; is that right?

"A. That's right.

"Q. So we have nobody's word but yours—

"MR. HOLLOWAY: Judge, that's argumentative; I object to that.

"THE COURT: Sustained.

"MR. HUGHES: Did you know how much marijuana there was there?

"A. I saw the bag but I was going to take the man up there to look at it to know how much it was.

"Q. Did you know what the price was going to be?

"A. Yes, sir.

"Q. How does it break down pricewise?

"A. I believe they said $150.00 a pound—it was two bags.

"Q. And you were the one that—you arrived at that price yourself?

"A. No, I did not.

"Q. All right. Where were you living when this came about back on November the 14th of 1974?

"A. I was living where I am now, with my mother and father.

"Q. And what was the fellow's name that owned this apartment?

"A. Carl Nelson.

"Q. Is he a friend of yours—a good friend of yours?

"A. Well, he is a friend; I wouldn't say good friend, but he was a friend of mine."

This Court believes that our original statement of the facts, which, as in all cases, was an effort to give a succinct rendition of same, may have been too favorable to the appellant, upon further examination of the record. We therefore set out the disputed evidence verbatim.

The jury resolved the conflict in the evidence in favor of the State's witnesses, and this is fully supported by the record in this cause. Clearly, therefore, the trial court properly submitted this matter to the jury. *Grissom v. State,* 51 Ala.App. 285, 284 So. 2d 739; cert. denied 291 Ala. 780, 284 So. 2d 740; *Carmichael v. State,* 48 Ala.App. 748, 267 So.2d 538; *Daniels v. State,* 49 Ala.App. 654, 275 So.2d 169.

Upon reexamination of the record, we adhere to the views expressed on original deliverance, that the trial court properly determined that under the testimony in this cause, there was no room for the operation of the defense of entrapment. Authorities cited on original deliverance.

Opinion corrected and extended: application overruled.

All the Judges concur.