A jury returned a general verdict finding defendant guilty under a two-count indictment charging him with a violation of the Alabama Uniform Controlled Substances Act of 1971 (Code of Alabama Recompiled, 1973 Cum. Supp. Tit. 22, §§ 258 (25)-258 (60)). One count charged him with possession of one hundred tablets of amphetamine; the other charged that he did unlawfully "sell, furnish or give away one hundred tablets of amphetamine." The court fixed his punishment at imprisonment for seven years and sentenced him accordingly.
The evidence in the case was brief, particularly the testimony of the State as to the conduct of defendant. It is contained in the testimony of one witness, an undercover officer of the Huntsville Police Department. He testified that at 3:10 a.m., September 5, 1973, he went to the apartment of defendant at 120 Smith Street, Huntsville, and purchased one hundred tablets from him, after telling him that he was interested in some "speed," which he said is the street name for amphetamine. The witness further testified that he kept intact the tablets or pills purchased until he could get to the office and then placed them in a white envelope, on which he wrote an identifying legend, and placed it in a metal locking cabinet.
On cross-examination of the undercover officer, it was shown by him that he was accompanied to defendant's apartment by a paid informer of the police department, a girl he knew by another name, but whom he identified as "Sherrie." He said Sherrie informed him that they could probably obtain some speed at defendant's home. He said that Sherrie knocked at the door at first and then he knocked, and after they had knocked eight or nine times, defendant came to the door and asked who it was and she said, "Sherrie," and defendant "said something — I don't recall what it was and then he opened the door and Sherrie introduced me to him and we, went on in the living room through the front of the house." He said Sherrie, he thought, first asked him if he had any speed and he said, "Yes." The three apparently talked together about five or ten minutes and then Sherrie "just faded out of the conversation." Thereafter, according to him, he and defendant had a "random conversation," during which Sherrie was at one time "sitting on the couch but she got up and either went to the bathroom or to a bedroom — I don't know where she went." He said he went into the kitchen with defendant, where defendant obtained the "white crosses" out of a "larger baggie."
Mr. Alan Adair, a criminalist with the Alabama Department of Toxicology and Criminal Investigation, testified that he took ten of the tablets from the envelope in which they had been placed by the undercover agent, and subjected them to a detailed, appropriate micro-chemical test and *Page 632 
determined that they contained amphetamine.
Defendant testified that he had known Sherrie but that his relationship with Sherrie "was about to break apart" prior to the time he and the undercover agent came to his apartment, and the transaction took place with reference to the amphetamine. He said that at that time he was going with a girl by the name of Lynn and that she was with him in the bedroom when the undercover agent and Sherrie came to his apartment and obtained the amphetamine. He said that on the day or night before Sherrie brought "two little baggies of what we call white crosses" and asked him to keep them for her; he stuck them in his dresser drawer. According to defendant, Sherrie and the undercover agent came to his apartment at 3:00 a.m. on the morning of September 5, 1973, and banged on the doors and the windows. At that time, he was in the bedroom with Lynn, and the apartment was being occupied by another person, a young man by the name of Bob, who first went to the door, cracked the door and went back to his bedroom. Sherrie than came over and rapped on his door and I got up and she introduced me to this individual that was with her as a cousin from Nashville that was on his way to — as a truck driver — and it was Three o'clock in the morning and she said she needed that speed." He said he went back in the bedroom and obtained the speed for her. He said:
 "She took me out in the kitchen and she said that since it was her cousin she was wanting them to be sold to him so she could make some money off them. She wanted me to charge him Forty Dollars for them and I said, `what?'
 "Q Well, did you give her the pills like this Simpson —
"A I gave her the pills.
 "Q Did you engage in any conversation with any man thereabout — did you sell some pills to anybody that night?
"A I didn't sell them per se.
"Q Did you give them to this Sherrie girl?
"A I gave them back to Sherrie, correct.
 "Q That man that was there, had you ever seen him before?
"A To the best of my knowledge, no."
The undercover agent had testified, as to which there was no conflict in the evidence, that defendant charged him forty dollars for the tablets, but that the undercover agent only had thirty dollars with him at the time, that he gave defendant twenty dollars with the understanding between them that he would pay him the other twenty, which was never paid.
Lynn testified that she was formerly a close friend of defendant, which close friendship she emphasized by stating that she was living in the apartment with defendant, and was with him in his bedroom, at the time of the occurrence involved; that Sherrie came there the night before and gave defendant a small bag and asked defendant if he would keep it for her. According to her, the next night, when Sherrie and the undercover agent came to the apartment, Sherrie told defendant that she needed what she had given him the day before; defendant came in the bedroom, "got it and he took it back out and he handed it to her." At the time of the trial, it had been "a year and a half" since she dated defendant.
Robert, who was sharing the apartment with defendant, testified as to the relationship between defendant and Lynn, as well as to the previous relationship between defendant and Sherrie, and that he was in the apartment when Sherrie and the undercover banged on the door and window, that he let them in and then "went directly back to bed but I did hear some voices."
A major insistence of appellant is that the evidence sustained his claim of entrapment and that by reason thereof, he should have been found not guilty. He requested in writing a general charge in his favor, with hypothesis, which was refused by the trial judge.
Appellee takes the position that appellant is precluded from the defense of entrapment by reason of a denial that he *Page 633 
committed the offense charged. This principle is now well established in Alabama. Owens v. State, 291 Ala. 107,278 So.2d 693 (1975); McCarroll v. State, 294 Ala. 87, 312 So.2d 382
(1975). We turn to the question whether defendant denied that he committed the offense charged. As stated in McCarroll:
 "The defense rests on the defendant's admitting the deed but disclaiming the thought. Lindsay v. State, 41 Ala. App. 85, 125 So.2d 716 (1960)."
Although the evidence is not altogether satisfactory as to all of the particulars that took place at the time of the commission of the alleged crime, we do not understand that defendant denied that he received twenty dollars from the undercover agent for the controlled substance received by the agent. This was the positive testimony of the agent. Defendant was not asked either by the State or defendant's counsel whether such was true; but, as we view the record, that feature of the transaction was assumed by all to be true, and there was no issue made as to it. Furthermore, unlike the facts inMcCarroll, where defendant admitted he sold capsules to the undercover agent, but contended they contained whole wheat flour, instead of a prohibited substance, defendant in instant case admitted enough to show that he knew that the tablets were contraband. Defendant did deny that "the pills were his," as urged by appellee, but he did not deny that he possessed them or that he sold them. His statement that he "didn't sell them per se" is, in the context of the record as a whole, to be understood as an admission that he took part in the transaction, including that part testified to by the undercover agent, as to which there is no conflict in the evidence, wherein the passing of twenty dollars from the agent to defendant is shown.
In addition, unlike Owens and McCarroll, all parties on the trial of this case, including the court, the State and defendant, recognized the defendant's standing to insist on his defense of entrapment. The trial court orally charged, and gave the jury some written charges requested by defendant, on the subject.
In a number of appeals in Alabama from convictions of possession or sales of narcotics or drugs, efforts were made to show that defendant was entitled to an acquittal by reason of entrapment. In most, if not all, of them, the efforts failed.Boswell v. State, 290 Ala. 349, 276 So.2d 592, app. dis'd,414 U.S. 1118, 94 S.Ct. 855, 38 L.Ed.2d 747 (1973); Reynolds v.State, 56 Ala. App. 509, 323 So.2d 394, cert. denied 295 Ala. 415, 323 So.2d 404 (1975); Miller v. State, 53 Ala. App. 213,298 So.2d 633, cert. denied, 292 Ala. 741, 298 So.2d 639
(1974); Pinson v. State, 52 Ala. App. 444, 293 So.2d 869. InBoswell, the Supreme Court expressly approved what was stated in Johnson v. State, 36 Ala. App. 634, 636, 61 So.2d 867, 869
(1952), as follows:
 "[E]ntrapment is not available as a defense to a person who has the intent and design to commit a criminal offense and who in fact does commit the essential acts constituting it, merely because an officer of the law, in his effort to secure evidence against such person, affords him an opportunity to commit the criminal act. . . ."
It is not contended by appellant, nor was it contended by defendant on trial, that the undercover officer himself entrapped defendant, but that the informer, Sherrie, while acting as an agent for the city of Huntsville, and in turn an agent for the state of Alabama, entrapped defendant. In this respect, as well as in another respect hereinafter discussed, instant case is different from the cases cited in which the defense of entrapment was not upheld on appeal.
It has been firmly held by many respected authorities that the government cannot utilize the services of an informer or informant and be allowed to disown his (her) actions in order to prevail against a defense of entrapment. Sherman v. UnitedStates, 356 U.S. 369, 373-374, 78 S.Ct. 819, 2 L.Ed.2d 848;State v. Tomlinson, 243 N.W.2d 551 (Iowa 1976); People v.Stanley, 68 Mich. App. 559, 243 N.W.2d 684 (1976); United Statesv. Mosley, 496 F.2d 1012 (5th *Page 634 
Cir. 1974); People v. Dollen, 53 Ill.2d 280, 290 N.E.2d 879
(1972); State v. Talbot, III, 135 N.J. Super. 500, 343 A.2d 777
(1975); State v. Moore, 69 Wn.2d 206, 417 P.2d 859 (1966);Lynn v. State, 505 P.2d 1337 (Okla.Cr. 1973).
Under the uncontradicted evidence in the case now under review, the informer Sherrie furnished defendant with the controlled substance, the amphetamine tablets, which she is alleged to have possessed and sold. According to a number of cases, this single fact distinguishes such a case from the host of cases in which the defense of entrapment was not upheld. InPeople v. Strong, 21 Ill.2d 320, 172 N.E.2d 765, the Supreme Court of Illinois tersely held:
 "We believe the record as a whole tends to show that defendant's only sale was of narcotics supplied to him by an informer in the employ of the government. This constitutes a valid defense of entrapment and the defendant should have been discharged."
More recently, the Supreme Court of Arizona, in State v.McKinney, 108 Ariz. 436, 501 P.2d 378 (1972), held:
 "In cases wherein narcotics are supplied by the state, the courts are in agreement that the state is providing more than the opportunity to commit the offense, they are also providing the very means for the commission of the crime."
In McKinney, the court quoted approvingly what had been said more than ten years previously by the Supreme Court of Illinois in People v. Strong, supra, as follows:
 ". . . We know of no conviction for sale of narcotics that has been sustained when the narcotics sold were supplied by an agent of the government. This is more than mere inducement. In reality the government is supplying the sine qua non of the offense."
In Jones v. State, 285 So.2d 152 (Miss. 1973), defendant's conviction was reversed and defendant discharged under facts in many respects similar to the facts in the case now under review. According to the testimony of defendant, he and the admitted paid informer of the State had been good friends and had smoked marijuana together. The informer told defendant that he had a good friend in town who wanted to buy some marijuana, that the informer had marijuana for sale but was indebted to the friend and if he sold his friend the marijuana he would expect the informer to give him the marijuana to be applied on a debt from the informer to the friend. Defendant finally agreed to make the sale for the informer; the informer showed defendant where the marijuana was hidden. Thereafter, two representatives of the Mississippi Narcotics Bureau, together with the informer, met defendant and proceeded to the point of the hidden marijuana, where it was retrieved by defendant and sold to one of the undercover agents for fifteen dollars. The court said:
 "We come now to the proposition of whether or not the defendant was entitled to a directed verdict because the marijuana which he sold was supplied to him by a paid confidential informant. The undercover agents were not aware of the fact that Agregaard, the confidential informant, had furnished the marijuana to the defendant at the time they made their purchase, but their lack of knowledge on this point would not bar the defense of entrapment. In Alston, supra [Alston v. State, Miss., 258 So.2d 436], the Court stated that entrapment was an affirmative defense and the defendant must go forward with proof necessary to establish the defense, and if he does so the state has the burden of proof on that issue. In this case the defendant, by his testimony, established the defense of entrapment with no rebuttal on the part of the state."
In Jones, supra, as well as in other cases cited, in which the judgments of conviction were reversed by reason of the establishment of the defense of entrapment in cases where an informer, working at the behest of the government, had furnished defendant the drug or narcotic necessary for his conviction, the informer did not testify. In those cases, the principle was recognized, as it was in Jones, supra, that as the burden *Page 635 
was upon the State to prove by the evidence beyond a reasonable doubt the guilt of defendant, an affirmative showing by defendant that he had been entrapped by an informer, who did not testify in the case, the burden was not upon defendant to corroborate his testimony by the testimony of such an informer but if the testimony of the informer was necessary to provide a conflict in the evidence on the issue of entrapment, it was the State's duty, not the defendant's, to produce the informer as a witness.
We are not saying what the informer in this case would have testified, if she had testified, or what she will testify in the future, if she is called upon to testify. The lack of extrasensory perception prevents the former and the gift of prophecy would require the latter. We must judge by the record before us, with a full realization of the possibility that if the State had met its burden, the case would not have to be reversed. We cannot base a judgment on "what might have been." Logic requires us to reach the same conclusion stated in UnitedStates v. Bueno, 447 F.2d 903, 906 (5th Cir. 1971) as follows:
 "Neither party produced the Informer. If the Informer's testimony would tend to disprove the Defendant's story, it was up to the government to produce him. The Defendant having testified to facts which establish a defense as a matter of law, the government has the duty to come forward with contrary proof, if it is to carry its ultimate burden of proving guilt beyond all reasonable doubt. United States v. Groessel, 440 F.2d 602 (5th Cir. 1971)."
An anomalous situation is presented in that the appellant in this case is presently the appellant in two other controlled substances cases before this Court, which are in the process of determination. Messelt v. State, 8 Div. 712, Ala.Cr.App.,351 So.2d 636 (1977) and Messelt v. State, 8 Div. 754, Ala.Cr.App.,351 So.2d 640 (1977). The evidence supporting the convictions in both cases is strongly indicative of the disposition of defendant to traffic in drugs and narcotics. However, we cannot lift such evidence from those cases, especially as they are later cases than this one and are for alleged later crimes than the one here involved; and thereby supply omissions on the trial of this case of any evidence even tending to show defendant's predisposition to commit the crime charged. Even so, it is doubtful that where, as here, defendant was furnished with the prohibited substance by the informer, acting for the State, and induced by said informer to commit the specific crime, which he would not have committed, but for the informer's action, his willingness to commit a similar crime, or his predisposition to the commission of such crime, would disentitle him to the defense of entrapment. Although there is authority to that effect, we do not find it necessary to decide the question now.
For the reasons stated, the judgment should be reversed and the cause remanded.
Other questions have been raised herein by appellant that are fully discussed and decided adversely to appellant in his other two cited appeals on other convictions.
The foregoing opinion was prepared by Supernumerary Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under Section 2 of Act No. 288, of July 7, 1945, as amended; his opinion is hereby adopted as that of the Court. The judgment is hereby reversed and the cause remanded for another trial.
REVERSED AND REMANDED.
All the Judges concur. *Page 636