304 So.2d 898

**O'Neal FARR**

**v.**

**STATE.**

**6 Div. 757.**

Court of Criminal Appeals of Alabama.

Dec. 17, 1974.

Finis E. St. John, III, and Asa Hartwig, Cullman, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and Don C. Dickert, Sp. Asst. Atty. Gen., Brundidge, for the State.

HARRIS, Judge.

Appellant was convicted of murder in the first degree and sentenced to life imprisonment. He was represented both at arraignment and trial by court-appointed lawyers, who represent him on appeal. He pleaded not guilty and not guilty by reason of insanity. He was furnished a free transcript on appeal, but he is serving what is called a "working appeal", at this time.

Appellant killed his wife by shooting her in the left arm at the shoulder and the slug

ranged downward and penetrated her lungs, liver and other vital organs. She was kneeling on the floor beside him when he fired the fatal shot. The place where the slug came to rest in her body was approximately eight inches below the entrance wound from the opposite side of the body.

Appellant and deceased were living together as husband and wife in a mobile home in a trailer court in Cullman at the time of the homicide. She was eighteen years of age, and this was her first marriage. Appellant was a thirty-four year old divorced man, who had two children by a previous marriage. There was some question as to whether this was a ceremonial marriage or a common law marriage, but both appellant and deceased told her mother they were married and had visited in each others' homes on several occasions. Sometimes they spent the night with her mother and occupied the same bedroom. A baby girl was born to this marriage, but from the time she left the hospital she went to live in the home of her maternal grandmother and received no support from either parent, though the father ran a taxi cab business and the mother worked with the company. The grandmother took the child to raise, and she was almost three years of age at the time of the trial. The homicide occurred in the mobile home of the parties around 5:30 A.M. on May 30, 1973.

Shortly before the shooting appellant sent his wife to the mobile home of a Mr. Wesley Quick, who lived in the same trailer court. She awakened Mr. Quick and told him her husband wanted to see him. Mr. Quick got dressed and walked to the trailer home of appellant and his wife, which had only a vacant lot between them. When he went in, appellant and the deceased were sitting at a table in the kitchen area. Subsequent events tell this bizarre story.

The deceased had been having an affair with another man who was known to appellant and who had visited in their home. The day before the killing the deceased and her paramour left town together. After they left, appellant found $1,500.00 was missing from his cab stand and he reported this to the sheriff's office. He told the officer that he suspected his wife had taken the money. He also told Mr. and Mrs. Quick that same afternoon that his wife had taken the money and left town with Billy Joe Lee. That night appellant went to a town in Mississippi and sometime during the night he found Billy Joe Lee and his wife in a motel room. His wife was nude, but he did not remember the state of dress of Billy Joe Lee. There was no shooting in the motel. Mrs. Farr never denied she was nude in the motel with Mr. Lee when discovered by her husband. Appellant got his wife and they returned to their trailer or mobile home in Cullman.

Now back to the morning of the killing when Mr. Quick entered appellant and deceased's home. Mr. Quick tells it this way:

"Well, when I walked in, O'Neal was drinking and he told me to take a drink and he pushed a bottle of whiskey over there and I told him no, it was too early for me. I told him I would take a cup of coffee and he told Frances to fix me a cup of coffee and she did and O'Neal got up and told me about going to Burnsville, Mississippi—said she run off with Billy Lee, and he went and got her, and brought her back, and he told her— told Frances, said you tell him about it, and Frances said no. So he made her get out of her chair and she was on the floor on the right side of him.

"And I told him the girl don't have to tell me nothing. And he said, well, she is going to tell you about it, and I said no, leave her alone O'Neal. Well, she started to crying and O'Neal slapped her back, and I told him, O'Neal, don't do that. Well, he first told me that they had stole my money—they had stole some money off me, and I give a hundred and fifty dollars for the shotgun—will you take it home and keep it for me? And I said yes, and I took the gun

and stood it right by the door where I was sitting. And he turned around and put the gun (pistol) down by her side, and I said O'Neal, lay that gun down, and so he winked at me and kinda smiled, and he kept telling her tell him how sorry you are. And I said, O'Neal, she don't have to tell me nothing.

Whatever she done, it is nothing to me. So, he picked the gun again and turned around and I told him, I said, O'Neal, lay the gun down, and so he winked at me and grinned again, and laid it back down. And the third time when he picked the gun up and turned around, that is when he shot her."

The witness further testified that the deceased was still on her knees when she was shot. He said appellant was drinking heavily, but he had never seen him drunk, and he did not think he was drunk but he sure was drinking heavily.

Just before appellant shot the deceased and while pointing the pistol at her, he told her she didn't love him anymore and tried to make her say she did not love the baby but she refused to do so saying, "I love that baby, and it is not true that I don't."

After the shooting appellant threw the pistol on the floor and said, "Oh, I have killed her." Mr. Quick told him she was not dead yet and he would go call an ambulance. As Mr. Quick started out the door appellant said, "I had just as well to shoot myself." Appellant picked his wife up by the shoulders and was dragging her to the front door as Mr. Quick walked out. As Mr. Quick started around the corner of the mobile home to get someone to call an ambulance, he heard two pistol shots in the mobile home. Mr. Quick went home and told his wife that appellant had just shot his wife and had threatened to shot himself and to call the ambulance. The Quicks did not have a telephone, and Mrs. Quick went to another mobile home and awakened a Mrs. Boyd who was an LPN at the Cullman Hospital. Mrs. Boyd called

the ambulance and told Mrs. Quick to call the sheriff as she was going to appellant's home to see if she could be of any help. When she got there, she found Mrs. Farr lying partly out of the front door on a small step-up platform and the rest of her body on the inside of the mobile unit. Mr. Farr was lying face down on top of Mrs. Farr with his face on her chest. He was grunting and groaning but was not able to speak. Mrs. Boyd felt his pulse and it was very slow and weak. She felt Mrs. Farr's pulse and there was no pulse beat.

When the ambulance came both appellant and his wife were rushed to the emergency room of the hospital. Mrs. Farr was dead and Mr. Farr was unconscious and fluids were immediately started intravenously. He responded well and soon regained consciousness. The ambulance attendant asked appellant where he shot the woman and he said, "In the ——— ——— arm, you ——— ——— ——— ———. I shot Frances. I shot my wife. Is she dead?" He was advised they did not know at that time but that she was quiet right now. Appellant then said, "I shot Frances, I hope to ——— ——— ——— she is dead."

Mr. Van Pruitt, laboratory director of the North Alabama division of the Alabama Department of Toxicology and Criminal Investigation at Huntsville, conducted an autopsy on the body of Mrs. Farr. His qualifications were admitted by the defense. He traced the path of the bullet through the body of the deceased as follows:

"It ranged through the muscular—the muscle of the arm, not striking the bone of the arm, but the muscle of the arm. And ranged in through the armpit, not exiting the arm, but going underneath the armpit under the skin, and entered the left chest cavity between the third and fourth rib—ranging in respect to the body from the left side to the right side and downward and very slightly forward. The path from that point was straight through the lung into the open

chest cavity, and at that point it passed through the liver and re-entered through the diaphragm and terminated at the level of the space between the ninth and tenth ribs over on the right side of the chest wall."

The witness further testified that the cause of death was a single gun shot wound sustained in the left outside arm at the shoulder area, which entered the chest and produced an injury to various organs within the chest. He estimated the muzzle of the gun was from four to ten inches away as there were dark smudges or residue on the clothing at the point of entrance.

The officers picked up the pistol from the floor of the mobile home where appellant dropped it and sent it together with two spent cartridges and two unspent cartridges to make a microscopic examination and comparison. Mr. Pruitt described the weapon as a .25 caliber Gradoga automatic loading pistol, Serial Number CDM 1748. He test fired the pistol and made a microscopic comparison with the slug recovered from the body of Mrs. Farr and expressed the opinion that this particular pistol fired the bullet removed from the body during the autopsy. The pistol and cartridge hulls and slug were admitted in evidence without objections.

A county investigator went to the scene of the shooting, but Mr. and Mrs. Farr had been removed when he arrived. He made photographs of the interior and exterior of the mobile home. On the table in the kitchen he saw a vodka bottle that was practically empty, a pint bottle of whiskey which was almost full. The coffee cup that Mrs. Farr served Mr. Quick was on the same table, together with fourteen dollars in currency, some change and a letter and some notes. A photograph was also made of the pistol on the floor. All photographs were admitted in evidence without objection.

The afternoon before the shooting, which occurred the next morning, the appellant told Mrs. Quick that his wife had taken some money from him and that she was going to leave with Billy Lee, and that he was going to kill her if she did.

Had appellant shot and killed his wife while she was nude in a motel room with another man, this would have been a homicide committed in the heat of passion, and would very likely have reduced the grade of the homicide from murder to manslaughter, or might have resulted in a verdict of acquittal. But instead of doing this, he made his wife dress and brought her back to Cullman, where he started drinking and brooding. He continued to drink and brood until he was pretty well intoxicated. He made her go to another mobile home in the trailer park to tell Mr. Quick he wanted to see him. When Mr. Quick arrived, appellant tried to make his wife confess her sins in his presence and she refused to do so repeatedly. He made her get on the floor and slapped her and while she was crying he made her say, "I am as sorry as you think I am", several times. He pointed his pistol at her three times and put it down on the table twice at the command of Mr. Quick, but the third time he picked up the pistol he shot his wife while she was still kneeling, and she fell back on the floor.

There is no law, in the absence of a statute, which wholly excuses a husband from liability for killing his wife while in the act of adultery, but if he immediately slays his wife, as a matter of law, the provocation is sufficient to reduce the killing to manslaughter. Hooks v. State, 99 Ala. 166, 13 So. 767; Brunson v. State, 212 Ala. 571, 103 So. 664.

A husband who finds his wife in the act of adultery and is moved by passion, naturally engendered, immediately kills his wife, he is not guilty of murder but of manslaughter only, but if there is time for the husband's passion to cool and for reason to re-assert itself before he kills her or if he kills her immediately, but because of prior malice, hatred, or desire to

avenge the wrong, and not in the heat of passion, the husband is guilty of murder. Warren v. State, 34 Ala.App. 447, 41 So.2d 201.

The court charged the jury on every aspect of the law on homicide on the evidence presented by this record including the law of intoxication. He charged on the four degrees of homicide embraced in the indictment, and it was solely within the province of the jury to decide the degree of homicide and fix the punishment.

Before the ambulance arrived, appellant shot himself twice with the same pistol. One bullet lodged in his spinal cord and rendered him paralyzed from his waist down. He had to undergo several surgical procedures at the Spain Rehabilitation Center, University of Alabama in Birmingham. During these long periods of hospitalization while in a paralyzed condition, he developed decubitus ulcers common to all paraplegics. These type sores are most difficult to treat and require periodic drainage and ointment treatements every few hours plus pain relieving medications. These patients must be turned in bed several times day and night and can rest better while lying on a sheep-skin pad. If not medically controlled a decubitus ulcer will eat to the bone and the bone will become infected.

Appellant's counsel filed a motion for a continuance so that a psychiatric examination and evaluation could be made. The motion was granted. The court granted several more continuances because of appellant's physical condition.

Finally, it was determined that appellant could sit in a wheel chair and the court refused to continue the case again. It was made known to the court that every three to four hours the dressings on appellant's ulcers would need changing and replaced with new salve and dressing and that his sister could do this. A cot was brought to the courtroom. When the sister made known to the court it was time to change the dressings, the court recessed the trial for fifteen minutes and the courtroom was cleared. After the dressings were changed the trial resumed.

Appellant did not testify and offered no evidence whatsoever in his defense. He did move the court to exclude the state's evidence and he requested the affirmative charge. He also filed a motion for a new trial based upon the action of the court in denying his motion for a mistrial because of the District Attorney's argument to the jury that the state's evidence was uncontradicted claiming this statement was a comment on the defendant's failure to testify.

Appellant was represented by two outstanding trial lawyers. Both of these astute lawyers have filed in this court "no merit" briefs and have notified appellant to this effect.

■ The testimony and evidence for the state being uncontradicted, there was no error in overruling the motion to exclude the state's evidence and in denying the affirmative charge.

■ With respect to the motion for a mistrial, we will quote from the record:

"MR. ST. JOHN: Judge, we object to the two portions of the district attorney's closing argument which were in direct comments on the defendant's failure to take the stand and testify in his own behalf. The first comment had to do with the fact that the defense had not proven anything to the jury. And the second one was that the jury had to decide the case on the evidence that they had heard from the stand, and that it was all undenied.

"MR. HARTWIG: On the grounds that it materially prejudiced the case of the defendant.

"MR. ST. JOHN: It was an attempt to prejudice the jury on the basis that the defendant had not testified in his own behalf by implication.

"THE COURT: Anything further?

"MR. ST. JOHN: On the basis of those comments which we do not feel could be erased from the minds of the jury, we move for a mis-trial.

"THE COURT: Do you have anything you wish to say about it, Mr. Bland?

"MR. BLAND: I will say I don't remember using the words that the defense —whatever the way that he put it there —didn't deny it. I did say that the evidence from the witness stand was not contradicted, and that it—I believe I said should be set to this jury. I don't know exactly how I worded it.

"MR. ST. JOHN: I don't know how you exactly worded it, but you said un-denied.

"MR. BLAND: I don't remember about the denied, but I said—used the word denied.

"MR. ST. JOHN: You said the word un-denied, and you said it has been un-denied.

"MR. BLAND: By the evidence.

"MR. ST. JOHN: You have got to decide it on the evidence that you have heard from the stand, which had been un-denied—you see?

"THE COURT: All right. The Court will deny your motion, and state for the record that the Court has already previously instructed the jury to disregard any statements made with regard to statements by the district attorney as to what the law or what might be happening in other parts of the country. And instructed the jury at that time that the Court—or rather, the statements by the attorneys in closing argument are not evidence and should not be considered as evidence by the jury. Further, that the Court did not understand the statement of the district attorney to be like it is alleged to be by the defendant's attorney, Mr. St. John. And further, that the Court understands the statement to be referring to the evidence in the case generally, without any specific regard to the defendant or his failure to testify, and further, that the Court will instruct the jury as it pertains to the law, as regards the defendant's failure to testify and the fact that such failure to testify shall not and may not be used against him or incriminate him in any way in this case. Therefore, the defendant's motion is denied at this time."

Title 15, Section 305, Code of Alabama 1940, as last amended does not prohibit a prosecutor from drawing reasonable inferences from the evidence presented in a case, and statements to the effect that the evidence is uncontradicted or undenied are not prohibited by the statute. Swain v. State, 275 Ala. 508, 156 So.2d 368; Sellers v. State, 48 Ala.App. 178, 263 So.2d 156; Whistenant v. State, 50 Ala.App. 182, 278 So.2d 183.

There is no error in the record.

Affirmed.

ALMON, TYSON and DeCARLO, JJ., concur.

CATES, P. J., concurs in result.