This appeal follows a conviction for the offense of attempted murder, and sentence of 25 years in the State penitentiary. For the reasons outlined below, the conviction is due to be affirmed.
At trial, Carol Marie Clem testified that she worked with the victim, Brenda Robertson, at the Saginaw Steering Gear Plant.[1]
Clem testified that on the morning of Friday, April 13, 1984, she was parking her car at work when she saw Robertson pull up in the parking space behind her. The witness testified that as she walked toward the plant, Robertson ran past her and was followed by the appellant, who had a pistol in his hand. The witness stated that she heard approximately four or five shots ring out and then saw the appellant get into a Volkswagen and leave the parking area. *Page 878 
Glenda Pulley, one of the victim's co-workers, testified that on the morning in question, she arrived at the Saginaw Steering Gear Plant at exactly 6:50 a.m. The witness testified that as she was parking her car, she heard someone screaming and saw Robertson running in and out of the rows of parked cars while the appellant chased her. The witness stated that she heard a shot and then stated that the following occurred:
 "After I heard the shot, then I heard another shot and then I didn't see Brenda, you know, running and she was on the ground and I saw [the appellant] standing over her and I saw him pointing the gun down and I heard and I saw the three shots being fired on top of her. . . . My first thought was, `Oh my God she is dead.'"
According to the witness, the appellant stood over the victim, discharged three more rounds of ammunition, and then walked away. The witness testified that as the victim lay on her back in the parking lot, her hands trembled or shook as if she had the "palsy." The witness stated that she attempted to assist the victim, who was lying on the ground and bleeding.
Deborah Woods, another of the victim's co-workers, testified that, on the morning in question, as she arrived at work she observed the appellant pulling up behind her. According to the witness, the appellant appeared to be "in a hurry," because he stopped in one of the "aisles" instead of parking in a parking space. The witness stated that when she saw that the appellant had a gun in his hand, she got back into her car. The witness testified that she heard screams and a gunshot, and that when she looked out her car window, she saw the appellant chasing Brenda Robertson around the lot. According to the witness, Robertson was "scared," and was screaming and running. According to the witness, more shots were fired and then the witness saw the appellant "standing over [the victim] with a gun in his hand." The witness stated that the appellant walked over to his car (a green Volkswagen) and drove away. The witness testified that, although the victim was conscious, she did not speak, and had "blood all over the front of her blouse."
Herbert Jackson, Brenda Robertson's supervisor, testified that he arrived at work on the morning of April 13, 1984, and was entering the Saginaw Steering Gear Plant when he heard a gunshot. The witness stated that he saw Robertson running between the parked cars, pursued by the appellant, who was armed with a pistol. According to the witness, one shot was fired and then the appellant "fired another shot and [the victim] went down and he fired three more shots standing directly over her into her." The witness stated that the appellant held the gun with both hands and the sequence of shots was "pretty rapid." According to the witness, the victim was lying on the ground when the appellant "fired one shot and she rolled over on her side and he fired another shot and she rolled over on her back and he fired another shot." The witness stated that after the appellant shot Robertson three times, he continued to "pull the trigger and would jump back after the gun was empty." According to the witness, the appellant left the parking lot in a green Volkswagen and did not return. The witness stated that he went to assist the victim, who told him that "Charles" had shot her and that she was "hurting." The witness stated that the victim had been shot three times: in the left arm; in the region of the breast; and in the lower part of her body.
Sheriff Mike Blakely, Limestone County, testified that on April 13, 1984, he went to the parking lot at the Saginaw Steering Gear Plant in response to a dispatch. The witness testified that by the time he arrived, the ambulance had already left with the victim. The witness noted that there was blood on the pavement of the parking lot. Blakely testified that he learned that the appellant had turned himself in to the Decatur Police Department, so he went to Decatur to get the appellant. According to Blakely, while he was taking the appellant to the Limestone County Jail, he advised the appellant of his rights "in case he said *Page 879 
anything while we were going back to the jail." Blakely explained that these rights included the right to remain silent; the right to an attorney; the right not to talk unless counsel was present; the right to refuse to talk; and the right to have an attorney appointed if he could not afford one. According to Blakely, he also told the appellant, if he decided to talk, he could stop talking "at any time." Blakely testified that he did not threaten or coerce the appellant, nor did he tell him that things would be "better" or "easier" if he would talk. According to the witness, the appellant was not under the influence of any kind of drugs or intoxicants and appeared to know where he was, where he was going, and what was happening. The witness stated that the appellant began to voluntarily talk about the incident and testified as follows:
 "A. He started talking about the problems that he and his ex-wife had had and I asked why that he had done it and he said — was telling me the fact that something about going to court the previous day and he was going to have to pay up some money and I asked him did he intend to, you know, kill her, and he said that yes that he was angry with her and that he had intended to kill her — he wanted to kill her was the words that he actually used.
"Q. That he wanted to kill her?
"A. Yes, sir.
"Q. And that he was mad at her?
"A. Yes, sir."
In addition to the above statement, the witness testified that he also obtained a tape-recorded statement from the appellant.
Blakely testified that the appellant told him that the gun he had used was in his Volkswagen and that the appellant executed a consent form giving Blakely permission to search the car. Blakely testified that there was no attempt to coerce the appellant; to threaten him; to promise him any hope of benefit or reward; or tell him that things would go better for him if he would consent to the search. According to Blakely, he recovered a Model 19 Smith and Wesson .357 Magnum from the appellant's car. When the appellant was taken into custody, the witness stated that approximately five or six "non-spent" .357 Magnum cartridges were found in his pocket. Blakely testified that the appellant initially stated that he "wanted to kill" Robertson but then later told Blakely that he did not "intend" to kill her.
Brenda Robertson, the victim, testified that she is an inspector at the Saginaw Steering Gear Plant and had divorced the appellant in October of 1983. Robertson testified that on the morning of April 13, 1984, she went to work, parked her car, and got out of the car with her handbag and lunch in her hand. According to Robertson, as she was walking toward the plant, she glanced back to see if she had turned her car lights off. Robertson stated that when she looked back, she recognized the appellant's green Volkswagen and saw the appellant "running towards me with this weapon in his hand." According to Robertson, the appellant was walking fast at first but when she began to run, he "took off running." Robertson testified that, in an attempt to get away from her ex-husband, she began to run through the cars, screaming. Robertson explained that, without saying a word, the appellant shot her in the arm, and that she fell to the ground. After she was on the ground, according to Robertson, the appellant stood over her and continued to fire the weapon. Robertson explained that because of the pain, she moved from side to side while she lay on the ground. According to Robertson: "[I] asked him not to shoot me [but] he kept shooting. He said that I deserved it."
In addition to the initial gunshot wound in the arm, a bullet went through Robertson's left side, almost to the lung, and had to be removed. The third bullet went through her lower abdomen and came out through her hip. Because of these injuries, Robertson was hospitalized for approximately three weeks. Although she was released from the hospital on May 5, Robertson *Page 880 
was not able to return to work until the end of August.
The appellant testified that he and Brenda Robertson were married on August 29, 1981. On October 13, 1983, according to the appellant, they were divorced. The appellant testified that on April 12, 1984, he saw his ex-wife at a court hearing in connection with their divorce settlement. According to the appellant, Robertson's testimony at the hearing resulted in the judge's ordering him to pay $2,500 for a "'75 Volkswagen which was valued at $1,200." When the appellant refused to pay the full amount ordered by the judge, he was fined for contempt. The next day, according to the appellant, he went to talk to Robertson "about having me locked up" but denied that he went to the Saginaw Steering Gear Plant to kill his ex-wife. According to the appellant, he is still mad at Robertson because "I hadn't done anything to her."
According to the appellant's testimony, he waited at the Saginaw plant for Robertson to arrive at work. The appellant stated that when she got out of her car, he called out to her but she "started screaming and hollering and running." It was after she started running away, according to the appellant, that he picked up his gun and "started firing." The appellant stated that he did not intend to kill her; he said he was "just mad." The appellant testified that he could not recall how many times he fired the pistol but remembered that he had more shells in his pocket and could have reloaded the gun. The appellant stated that he drove to the Decatur Police Department and turned himself in after the shooting. The appellant testified that he told Sheriff Blakely that he did not intend to kill his ex-wife.
Under cross-examination, the appellant admitted that he would not have gone to jail for contempt of court if he had followed the orders of the domestic relations judge. The appellant also admitted that, on the morning of April 13, he went to the Saginaw plant, where he knew his ex-wife would be arriving for work, and waited for her to arrive. The appellant then testified as follows:
 "Q. [State's attorney]: And you were mad when you went there?
"A. [Appellant]: Yes, sir.
"Q. And Brenda began running from you?
"A. Yes.
"Q. With her back turned to you?
"A. Yes, sir.
 "Q. Now, you have owned other pistols before; haven't you?
"A. Yes.
"Q. You know a little bit about pistols; don't you?
"A. Yes, sir.
"Q. And this is a good pistol; isn't it?
"A. Yes, sir.
"Q. This is a fine pistol.
"A. Yes, sir.
 "Q. Next to Dirty Harry's .44 Magnum, that's probably one of the finest pistols you can own.
"A. Yes, sir.
"Q. That pistol will make holes in people; won't it?
"A. Yes, sir.
 "Q. It makes little holes where it goes in and it makes big holes where it comes out; correct?
"A. Yes, sir.
"Q. That pistol will kill people; will it not?
"A. Yes, sir.
 "Q. One shot from that pistol would kill somebody; wouldn't it?
"A. Yes, sir.
 "Q. And you started shooting with this lady's back to you while she was running from you; is that right?
"A. Yes, sir.
 "Q. She wasn't looking at you threatening you. You were just shooting?
"A. Yes, sir.
"Q. But you didn't mean to kill her?
"A. No, sir.
 "Q. And when you stood over her and emptied the gun into her body — did I hear you say on direct examination that *Page 881 
you were trying not [to] hit any vital parts or anything like that?
"A. No, sir, the chamber —
"Q. You were just trying to wing her?
"THE COURT: Let him answer the question, please.
"A. The chamber was emptied before I stood over her.
 "Q. Your testimony is that you didn't shoot her any more after you stood over her?
"A. Correct.
 "Q. Your testimony is that you shot her all three times when she was running —
 "A. Wait a minute. After she fell, I was still about fifteen or twenty feet away from her.
 "Q. Is it your testimony and are you telling these people that the three times that you did shoot her — you don't deny shooting her three times; do you?
"A. No, sir.
 "Q. Is it your testimony that the three times that you shot her, Mr. Gholston, you were just trying to wing her?
"A. Trying to do what?
"Q. Wing her.
"A. Yes, sir.
"Q. Not to kill her but just shoot her up a little?
"A. Yes, sir.
 "Q. After you had shot her, you didn't stick around to see whether she was alive or going to live; did you?
"A. No, sir.
 "Q. You never asked anybody there if she was alive. Isn't it a fact that you heard it over the radio coming back from Decatur that she was alive?
"A. No, sir. I heard it from Sheriff Blakely.
 "Q. You say you never stood over her and shot her; is that right?
"A. Correct.
 "Q. You say you never — let me ask you this. After you ran out of shells, did you continue to click the trigger?
"A. Yes, sir.
"Q. You did do that?
"A. Yes.
 "Q. You did do that. Okay. So, you admit that you did keep shooting after you had shot her three times?
"A. Yes, sir.
"Q. Were you going to wing her some more?
"A. Yes, sir. I didn't know what I —
 "Q. One last question, Mr. Gholston. If you weren't trying to kill her, what would you have done to kill her? Blown her up or something?"[2]
The jury returned a verdict of guilty for the offense of attempted murder and the appellant was sentenced to 25 years. Four issues are raised on appeal.
 I
The first issue concerns the sufficiency of the allegations of the indictment. In pertinent part, the indictment charged that the appellant did "with the intent to commit the crime of murder," attempt to commit said offense. The appellant argues that the failure of the indictment to allege that he intended to "kill or cause the death of" Robertson is a fatal defect.
Under Alabama law, an indictment must meet the following criteria in order to be legally sufficient:
 "An indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." § 15-8-25, Code of Alabama
(1975).
In general, an indictment must "contain the elements of the offense charged, and also sufficiently apprise the appellant of what he must be prepared to meet." Hardy v. State,409 So.2d 996, 1001 (Ala.Cr.App. 1982). It is sufficient if the indictment is worded "in such a manner as to enable a *Page 882 
person of common understanding to know what is intended."Matthews v. State, 401 So.2d 241, 245 (Ala.Cr.App.), cert.denied, 401 So.2d 248 (Ala. 1981). In the case sub judice, the indictment was properly worded and the trial court correctly overruled the appellant's motion to dismiss the indictment.Reese v. State, 456 So.2d 341 (Ala.Cr.App. 1982), cert. denied,464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124, reh. denied,464 U.S. 1004, 104 S.Ct. 513, 78 L.Ed.2d 701 (1983).
 II
The second issue concerns the refusal of the trial court to instruct the jury on the offense of first degree "reckless assault," as defined in § 13A-6-20 (a)(3), Code of Alabama
(1975). Although the trial court instructed the jury on the elements of first degree assault as defined in § 13A-6-20
(a)(1), Code of Alabama (1975), the appellant contends that the trial court erroneously refused to instruct the jury on the elements of first degree "reckless" assault.[3]
Although the appellant stated, subsequent to the assault on his ex-wife, that he did not "intend to kill her," the following outline of the evidence indicates otherwise:
 1. On the morning of April 13, 1984, the appellant went to his ex-wife's place of employment and waited for her arrival.
 2. The appellant admitted that he was mad when he went to see his ex-wife that morning.
 3. As soon as Brenda Robertson arrived at work, the appellant got out of his car and chased her through a parking lot with a fully loaded .357 Magnum. The appellant also carried additional rounds of ammunition in his pocket.
 4. As soon as the victim saw the appellant, she screamed and tried to run away, but the appellant pursued her.
 5. After shooting his ex-wife in the arm, the appellant stood over her and emptied the chamber of the pistol into her body, striking her 2 more times.
 6. After the gun was empty, the appellant continued to stand over her and pull the trigger of the gun.
 7. The appellant did not attempt to give aid or assistance to his ex-wife after he shot her; nor did he attempt to determine if she was dead or seriously injured.
The undisputed evidence presented at trial was that the appellant intentionally shot his ex-wife. The appellant admitted at trial that he wanted to "shoot her up a little." Additionally, the appellant admitted that his gun was a "fine pistol" which could "make holes in people" and could also "kill people." The appellant also admitted that one shot from a .357 Magnum could "kill somebody."
Where there is a "reasonable theory" from the evidence which would support a jury charge on a lesser-included offense, the accused is entitled to the charge. Williams v. State,474 So.2d 178 (Ala.Cr.App. 1985). "The defendant has the right to request instructions based upon any material hypothesis which the evidence in his favor tends to establish." Ex parte Stork,475 So.2d 623, 624 (Ala. 1985). In the case sub judice, the uncontroverted evidence was that the appellant intentionally shot his ex-wife; thus, he was not entitled to a charge on the lesser offense of "reckless" assault under § 13A-6-20 (a)(3),Code of Alabama (1975). The trial court properly denied the requested charge because there was "no rational basis for a verdict convicting the defendant of that offense." Eslava v.State, 473 So.2d 1143, 1147 (Ala.Cr.App. 1985).
Under § 13A-6-20, Code of Alabama (1975), a first degree assault is committed when the actor "recklessly" causes "serious physical injury to another by manifesting *Page 883 
extreme indifference to human life." Commentary, §§ 13A-6-20
through 13A-6-22, Code of Alabama (1975), (1982 repl. vol. at 175).[4] The commentary goes on to note as follows:
 "In legal contemplation it is somewhat difficult, if not impossible, to demarcate between a positive intent to harm and utter disregard for the safety of others. [This] provision is the counterpart to murder based on extreme indifference, § 13A-6-2 (a)(2). Thus, shooting into a crowd wantonly but without any specific homicidal intent would be first degree assault if the result was serious but nonfatal, and, if fatal, it would be murder."
In recent decisions which interpret the provisions of the "reckless murder" statute, this court has held that the statute would not apply where the "defendant's acts and omissions were specifically directed at a particular victim and no other."Northington v. State, 413 So.2d 1169, 1171 (Ala.Cr.App. 1981),cert. denied, 413 So.2d 1172 (Ala. 1982). Examples of acts which would constitute "reckless murder" would include homicide caused by such acts as the following: "driving an automobile in a grossly wanton manner, shooting a firearm into a crowd or moving train, and throwing a timber from a roof onto a crowded street." Id., at 1172, citing Napier v. State, 357 So.2d 1001,1007 (Ala.Cr.App. 1977), rev'd, 357 So.2d 1011 (Ala. 1978). By analogy to the "reckless murder" statute, the requested jury charge on "reckless" assault in the case sub judice was not warranted because the appellant's acts were specifically directed toward his intended victim.
 III
The appellant also argues that the trial court erred when it refused to instruct the jury on attempted manslaughter. Appellant argues that he was entitled to the charge of attempted manslaughter under § 13A-6-3 (a)(2) Code of Alabama
(1975), because he acted in the "heat of passion." Assuming,arguendo, that "attempted manslaughter" is a lesser included offense of a charge of "attempted murder," there was no "rational basis" in the evidence to support the requested charge. The appellant's consistent claim was that he did not want to kill his wife but merely wanted to "wing her" because he was "mad." Additionally, it is apparent that the evidence did not show sufficient "legal provocation" at the time of the assault in order to justify a claim of "heat of passion."
To prove adequate legal provocation in order to establish a defense of "heat of passion," the provocation must be of a "nature calculated to influence the passions of the ordinary, reasonable man." Biggs v. State, 441 So.2d 989, 992
(Ala.Cr.App. 1983).[5] The facts of this case do not justify a finding of "provocation" which would entitle the appellant to the lesser charge. Pennell v. State, 429 So.2d 679, 681
(Ala.Cr.App. 1983). Even if there was a sufficient showing of "provocation," the evidence showed that more than a 12-hour period of time elapsed between the time of one alleged "provocation" and the time that the appellant went to the steering plant to wait for his ex-wife. This was a sufficient period of time to "cool down," even if the provocation was established. Id. Thus, because there was no "reasonable basis" in *Page 884 
the evidence to support the requested charge, the trial court was not in error for refusing to give the charge. Pennell v.State, supra.
 IV
The final argument presented by the appellant challenges testimony given by Officer Blakely concerning certain statements made by the appellant. Appellant submits that the record does not establish that he was asked if he understood his rights. Additionally, the appellant argues that there is nothing in the record to indicate that he "knowingly, intelligently, and voluntarily waived his rights." Contrary to the appellant's position, the State's evidence tended to show that his statments were voluntary, and there was no evidence of coercion or improper action on the part of the authorities. The question of whether a statement is voluntarily made is for the trial judge, based upon a "preponderence of the evidence".Chambers v. State, 455 So.2d 1008, 1010 (Ala.Cr.App. 1984). Here, the voluntary nature of the statements was established by "substantial evidence," Chambers, at 1010.
Under the "totality of the circumstances" test, the mere fact that the accused did not expressly state that he understood his rights or sign a written waiver to that effect will not operate to exclude statements made which were otherwise voluntarily obtained. Love v. State, 372 So.2d 414, 415 (Ala.Cr.App. 1979);Minor v. State, 437 So.2d 651, 655 (Ala.Cr.App. 1983). The appellant admitted that he voluntarily turned himself in to the police, and nothing in the record supports a finding of coercion or duress on the part of the authorities. In fact, Officer Blakely testified that, after being advised of his rights, the appellant "started talking" about his problems with his ex-wife. There was nothing in the record to indicate that the appellant was intoxicated, under the influence of drugs, or in any manner unable to exert his free will. When the appellant took the stand, he did not deny making any of the statements he was alleged to have made.
AFFIRMED.
All the Judges concur.
[1] The victim, Brenda Robertson, was married to the appellant for a little over two years. According to Ms. Robertson's testimony, which was presented later in the trial of the case, she divorced the appellant in October of 1983, some six months before the assault in April of 1984. On the day before the assault, Robertson and the appellant appeared in court in connection with their divorce settlement. Prior to the divorce, according to Robertson's testimony, the appellant had threatened to kill her if she attempted to divorce him.
[2] Defense counsel objected to this final question and the trial court sustained the objection before the defendant had the opportunity to respond.
[3] A person commits the crime of first degree assault if "[u]nder circumstances manifesting extreme indifference to the value of human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to any person." § 13A-6-20
(a)(3), Code of Alabama (1975).
[4] In pertinent part, the term "recklessly" is defined as follows:
 "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." § 13A-2-2 (3), Code of Alabama
(1975).
[5] The most frequently cited examples of the "heat of passion" defense are the "discovered adultery" cases. Even where a spouse finds his mate in a compromising position, however, the spouse cannot claim the "heat of passion" defense, in a murder trial, where there has been time for the wronged spouse's "passion to cool and for reason to re-assert itself." Farr v.State, 54 Ala. App. 80, 83, 304 So.2d 898 (1974).